### STATE v. LORENZO DEBNAM.

(Filed 11 November, 1942.)

**1. Homicide § 18a—**

A dying declaration is not conclusive, its weight and credibility being for the jury to determine. It may be impeached or corroborated by other statements of the deceased relative to the homicide, although such statements do not qualify as dying declarations.

**2. Homicide §§ 6b, 20, 27b, 27d—**

The *intentional* use of a deadly weapon in a homicide imports malice and raises a rebuttable presumption that defendant is guilty of murder in the second degree. The presumption is not raised by the mere use of such a weapon, *Holding* a charge erroneous which omitted the word "intentional."

APPEAL by defendant from *Carr, J.,* at February Term, 1942, of FRANKLIN. New trial.

The defendant was charged with the murder of Foster Spivey. At the beginning of the trial the solicitor announced that he would not ask

for a verdict of murder in the first degree, but only for conviction of murder in the second degree. The jury returned a verdict finding the defendant guilty of manslaughter.

We understand from pertinent evidence in the case that a number of visitors had assembled at the house of one Jimmy Young, in the out-skirts of Youngsville. The defendant, Lorenzo Debnam, and Foster Spivey approached the house, and a shot was heard by those within the house. Whereupon, several persons rushed out. Debnam and Spivey were seen walking toward the house, Spivey holding his right wrist with his left hand, and saying that he was shot. Debnam asked Spivey "where did I shoot you." When DeWitt Kearney came out of the house and approached, asking Debnam why he shot the boy, the latter said "get back, get back." When Kearney attempted to take the pistol from him, Debnam broke and ran around the side on the other side of the house, leveling the gun on Kearney.

Another witness stated that as Debnam and Spivey approached, Debnam was holding Spivey's right wrist with his own left hand, holding his pistol in his right hand, and asking Spivey where he had shot him, and that Spivey said "Don't shoot me no more cause you done killed me now"; and that when DeWitt Kearney approached Spivey, he ran under Kearney's arm, backed up to the house, and with his pistol out, said "Stand back, don't a damn soul come on me." Some of the witnesses went around the car and some back up to the house and around the house, and Debnam "tore off across the field" and went up a little road through the plantation.

Spivey pulled his jacket back and blood was seen running out through his ribs along the left side, and Spivey said, "I am dying as fast as dirt." Spivey was carried to the hospital, where he died some four days later.

The deceased made a statement to his father, which was introduced upon the trial as a dying declaration. In this statement, he said he was going to die and that Lorenzo Debnam had shot him, but he did not know why or what he shot him for.

The defendant testified in his own behalf, and stated that the shooting was altogether accidental. His version of the occurrence was that Spivey offered to let defendant keep his, Spivey's, pistol, and Debnam agreed to do so; whereupon, Spivey handed him the pistol by the barrel, "and just as soon as it was in my hand it shot. I didn't know what had happened. Just as it landed in my hand it shot. I never had nothing against him—me and him run together all the time." Defendant states that he then went to John Emory's house and asked him to keep the pistol, stating that he had shot Foster accidentally, and would not have done it for anything in the world. He later made the same statement to Mr. Mitchell and Mr. Monty Hoyle. He was then carried to the lock-up.

The defendant was corroborated as to his statement that the shooting was accidental by Mitchell and Hoyle. Hoyle testified as to the friendly relations between the defendant and the deceased.

This witness visited Foster Spivey while he was in the hospital—on Friday night and again on Sunday—and had a conversation with him in regard to the circumstances of the killing. The witness was asked to relate this conversation, and on objection by the State, it was excluded from the evidence. If permitted to answer, the witness would have testified as follows: "He said—when I went to see him at the hospital—he told me to go back home and tell Mr. Mitchell to get Lorenzo out of jail—that he didn't intend shooting me, it was accidental and I want him out of jail and I want him to come to see me—I didn't want him punished because we are the best of friends and it was accidental." Defendant excepted.

In his charge to the jury, the court gave the following instruction: "The question boils down as to whether or not the State has satisfied you beyond a reasonable doubt that the defendant shot the deceased with a deadly weapon, which resulted in the death of the deceased. If the State has satisfied you of that fact it would be your duty to return a verdict of guilty of manslaughter." To this defendant excepted.

The jury found the defendant guilty of manslaughter, and from the judgment imposed, the defendant appealed, assigning errors, including the matters to which the foregoing exceptions were made.

*Attorney-General McMullan and Assistant Attorneys-General Patton and Rhodes for the State.*

*Yarborough & Yarborough for defendant, appellant.*

SEAWELL, J. We first consider the exception of the defendant to the exclusion of the evidence offered by the defendant through the testimony of M. D. Hoyle relating to a conversation which he had with Foster Spivey after the shooting and while the latter was in the hospital. The defendant offered this for the purpose of impeaching the dying declaration of Spivey made to his father, introduced by the State. It must be conceded that, if admitted, it would have had that effect, since the dying declaration made by Spivey shortly after the shooting may properly engender the inference that the shooting was not accidental, but, on the contrary, had some motive, however unknown to the declarant. That is also the appraisal which the State seemed to put upon this item of evidence as justifying its introduction.

The theory on which dying declarations are excepted from the hearsay rule and admitted in evidence is that the declaration is made under the realization of approaching death, when there is no longer any motive for

making a false statement, thus creating a sanction for truth equal to that of an oath. *S. v. Williams,* 67 N. C., 12, 14; *S. v. Beal,* 199 N. C., 278, 297, 154 S. E., 604; *S. v. Laughter,* 159 N. C., 488, 74 S. E., 913. Perhaps a more potent reason, one strong enough to supersede the right of confrontation, so strongly entrenched in our law, is the necessity of preserving important evidence, which often could come from no other source, of the identity of the killer and such circumstances of the killing as come within the range of the exception. It can readily be understood that such significant declarations, often attended with such dramatic force as to powerfully affect the jury, should in justice be subject to the rules of impeachment which attend other testimony, when impeachment is possible or impeaching evidence available. See *S. v. Williams, supra,* in the cautionary statements on pages 14, 15.

Had the deceased been a sworn witness, testifying in court, the proffered testimony that he had made an inconsistent statement, and more favorable to the defendant, explanatory of the occurrence, would readily have been admitted. We do not conceive the rule to be different when the defendant has the more difficult task of refuting a dying declaration without, of course, the advantage of confrontation and cross-examination of the witness, whose testimony is to be admitted, if at all, as an exception to the rule.

Upon this point, authorities seem to be strongly in favor of the suggested rule, which we believe to be founded upon reason and justice. In *Carver v. U. S.,* 164 U. S., 694, 41 L. Ed., 602, the Court passing upon this point, said:

"There was also error in refusing to permit the defendant to prove by certain witnesses that the deceased, Anna Maledon, made statements to them in apparent contradiction to her dying declaration, and tending to show that defendant did not shoot her intentionally. Whether these statements were admissible as dying declarations or not is immaterial, since we think they were admissible as tending to impeach the declaration of the deceased, which had already been admitted. A dying declaration by no means imports absolute verity. . . . In nearly all the cases in which the question has arisen, evidence of other statements by the deceased inconsistent with his dying declarations has been received. *People v. Lawrence,* 21 Cal., 368 (an opinion by *Chief Justice Field,* now of this Court); *State v. Blackburn,* 80 N. C., 474; *McPherson v. State,* 9 Yerg., 279; *Hurd v. People,* 25 Mich., 405; *Battle v. State,* 74 Ga., 101; *Felder v. State,* 23 Tex. App., 447, 5 S. W., 145; *Moore v. State,* 12 Ala., 764."

In *Ashton's Case,* 2 Lewin (Eng.), 147, it is said: "When a party comes to the conviction that he is about to die, he is in the same practical state as if called on in a court of justice under the sanction of an oath,

and his declarations as to the cause of his death are considered equal to an oath, but they are, nevertheless, open to observation, for though the sanction is the same, the opportunity of investigating the truth is very different and, therefore, the accused is entitled to every allowance and benefit that he may have lost by the absence of the opportunity of more full investigation by the means of cross-examination."

In *People v. Lawrence,* 21 Cal., 368—the case referred to in the above opinion in the Supreme Court of the United States—*Mr. Justice Field,* then Chief Justice of the Supreme Court of California, said: "Though the condition of the person making the declaration in the last hours of life, under a sense of impending dissolution, might compensate for the want of an oath, it can never make up for the want of a cross-examination, and, therefore, there would be no justice in any rule which would deprive the accused in such circumstances of the right to impeach the credit of the deceased by proof that he had made contradictory statements as to the homicide and its cause." See Annotations, 16 A. L. R., pp. 417-423.

In the North Carolina Law Review, Volume 14, page 382, upon a review of the authorities, the conclusion is reached that: "A dying declaration is not conclusive, its weight and credibility being for the jury to determine. It may be impeached in the same manner as any other sworn statement."

It has been held in this State that dying declarations may be corroborated by evidence that the declarant had made the same or similar statement as to the homicide, although such testimony was not qualified as a dying declaration. *S. v. Blackburn,* 80 N. C., 474; *S. v. Craine,* 120 N. C., 601, 602, 27 S. E., 72. It is our belief that the converse of the rule is a necessary corollary, consonant with the theory on which dying declarations are admitted in evidence and founded on principles of justice. There was error in excluding the proffered evidence.

The objection of the defendant to the instruction to the jury above quoted is that it omits the word "intentional," and not only permits, but requires, conviction upon proof of the mere killing by the deadly weapon, whether intentional or otherwise. The objection is well taken.

The intentional use of a deadly weapon in a homicide imports malice and raises the rebuttable presumption that the defendant is guilty of murder in the second degree, placing the burden upon him to show such circumstances as may reduce the crime to manslaughter, or entitle him to an acquittal. The presumption is not raised by the mere use of such a weapon.

The use of an inexact formula, while not to be approved in any case, may not result in reversible error, where the intentional use of the weapon is admitted; but where the defense is based on the theory of accidental

shooting and the intentional use is not admitted, but, on the contrary, denied, and becomes the crux of the controversy, the court must be meticulous in instructing the jury that the *intentional* use of the deadly weapon is necessary to raise the presumption.

The State calls attention to the fact that in numerous other parts of the charge the court did correctly state the law in this respect; and to this the defendant replies that the lapse in that respect was at a critical point in the charge, where the court "boiled down" all its preceding instructions to the one controlling principle, which it gave as guidance to the jury—making conviction to depend on whether "the defendant shot the deceased with a deadly weapon, which resulted in the death of the deceased." If so, the jury was admonished that it would be their duty to return a verdict of guilty of manslaughter. Under these circumstances, we are unable to apply in aid of the State the principle of contextual construction in order to relieve the instruction of prejudicial error. The instructions were contradictory, and sufficiently so, we think, to have, in all probability, caused confusion in the minds of the jury. *S. v. DeGraffenreid, ante,* 113; *S. v. Roddey,* 219 N. C., 532, 14 S. E. (2d), 526.

It is to be noted that the instruction here was upon the question of manslaughter, of which defendant was found guilty; and this discloses a further inexactness in the instruction, which must have been prejudicial to the defendant, notwithstanding any previous explanation which the court might have given with regard to the privilege of the defendant to mitigate the charge, or exculpate himself entirely upon a proper showing.

For the reasons here given, the defendant is entitled to a new trial. It is so ordered.

New trial.