Criminal prosecution upon two indictments, charging defendant in No. 731 with murder of Cora Lee Utley and in No. 732 with murder of J. T. Collins, consolidated by consent for purpose of trial and tried together. (See S. v.Grass, ante, 31.)
Upon the trial below the State offered evidence tending to show that on morning of 24 July, at time homicide in question occurred, "a picking crew," composed of Cora Lee Utley, age 24 years, wife of defendant, J. T. Collins, age 21 years, brother of Cora Lee Utley, Willa Meta Pugh, age 18 years, Elco Covington, who married niece of Cora Lee Utley, and perhaps others, under C. A. Campbell as foreman, were picking peaches at the Montgomery Orchard; that the defendant, armed with a butcher knife, the blade of which was 12 to 14 inches long, came into the orchard and approached "the crowd"; that J. T. Collins asked defendant if he wanted a job, to which defendant replied, "No, I believe not," "No," or "No, there isn't enough of them for me," as variously stated by witnesses, and that defendant immediately assaulted J. T. Collins, and then Cora Lee Utley, inflicting wounds from which they died.
Elco Covington, as witness for the State, described the occurrence in this manner: "I saw James Utley come down one of the peach rows toward where the crowd was picking. Cora Lee was picking, and J. T. and the other girl was picking another row above them. J. T. moved up to the other side and asked James Utley if he wanted a job. Utley said, `No, I believe not.' Then J. T. moved to another tree. James, the defendant, walked from the tree he was at and did like that and walked by J. T. like he was going to back up, and when he did he grabbed J. T. in the back of his belt and stabbed J. T. in the side with a butcher knife . . . in the right side, and if J. T. was doing anything or saying anything, I did not hear it. . . . J. T. went across the orchard. I saw him catch the pick-up. He was bleeding in the side. I did not see him any more. James pulled around the tree and went to his wife. Cora Lee. *Page 41 
Cora Lee ran to Mr. Campbell, and he ran after her. She tripped and fell, and when she did, I seen, James stab her through her arm with a butcher knife. He ran 12 or 15 feet after Cora Lee. . . . I next saw her standing up and James had walked off and she said he had killed her and fell back on the peach tree. . . . I heard him (defendant) ask Mr. Alex Campbell if she was dead and he told him Yes. He said if she wasn't he was going to finish her. Mr. Alex caught him on the shoulder and told him not to do that, he had done enough. Cora Lee did not strike at the prisoner at the time he stabbed her, and had no weapon in her hand, and I did not see any weapon in J. T. Collins' hand. Cora Lee died under the peach tree in about twelve minutes after she was stabbed. . . . James made no effort to render any assistance after he stabbed her. . . . I was about 18 feet away when James caught J. T. and about 12 feet when he caught Cora Lee. . . . I did not see J. T. pull a knife from his pocket and did not see James get cut on the thumb."
Willa Meta Pugh, also witness for State, gives this version: "I was in the orchard and saw James when he walked in the field. He stood in the row opposite the tree where we were picking, and J. T. asked him if he wanted a job, and James said No. When J. T. turned his back James grabbed him and stabbed him one time. He pulled the knife out of Collins and ran over to where his wife was; then he chased her around the tree and she fell, or he knocked her down, and then he stabbed her five or six times while she was on the ground. She did not say anything. . . . James did not say anything after he stabbed his wife; he left and went down behind the pick-up. He came back after she fell and wanted to know whether she was dead or not. He asked Mr. Campbell . . . said if she wasn't he was going to finish her. Cora Lee was not quite dead . . . she died a few minutes later. J. T. Collins left after he was stabbed. . . . Collins did not attempt to do anything to James, and I did not see Collins have any weapon. When James stabbed his wife . . . she had no weapon and I heard him say nothing prior to time he stabbed her. . . . I was standing between J. T. and Cora Lee and saw James when he struck at J. T. J. T. had nothing in his hand; I could have seen it if he had had one."
C. A. Campbell, also witness for State, gave this narrative of the occurrence: "I saw James walking in the field . . . James said `You are picking peaches?' I said `Yes.' He said, `They are right pretty.' I said `Yes.' He said `What kind are they?' I said, `Elbertas.' I was very close to him at the time. Someone asked him if he did not want a job. He said, `No, there isn't enough of them for me.' Cora Lee came running around me and James ran against me running. I said, `Here, don't do that, don't do that.' She ran in front of me and stumbled and fell face foremost. She rolled over right quick and he ran and dropped *Page 42 
down on her with his knee on her and stabbed her one time through the right arm, and then . . . I saw him stab her five times. J. T. ran around there and grabbed up a peach basket with about a gallon of peaches and hit James with it, and James jumped up and said, `I will finish you.' They ran out 18 feet away and J. T. grabbed a peach limb off a dead peach tree and struck at James. At this time my son-in-law came by on a pick-up and J. T. caught the back end and went off. James ran the pick-up down the field 35 or 40 yards and then he turned around and came walking back to where I was standing. `Cap, I am sorry I done it, but I had to do it,' he said, `those damn Collins' have been running over me for the last ten years.' I said, `James, you have done the wrong thing.' He said, `Do you know where I can get the law?' I said, `They will be here in a few minutes.' He said, `I will walk on down and wait for them.' He said, `If she ain't dead, I will finish her.' I said, `James, you have done plenty.' . . . I didn't see what occurred between J. T. and James before he got to his wife. I had my back to them, and I did not hear anything at all except what James said to me. . . . James was arrested about 500 yards from where the killing took place. So far as I know, he made no effort to get away."
Sheriff Bruton, who arrested defendant, described the wounds on the body of Cora Lee Utley as "one at the shoulder, three cuts in the right arm, one right above the hip, two stabs in the back a little to the right of the backbone that were to the hollow . . . seven . . . altogether," and those on the body of J. T. Collins, as "one cut across the stomach about 6 inches long that went to the hollow"; and "a stab wound on the right side of the stomach; it went to the heart. They appeared to have been made with a knife."
On the other hand, defendant, after testifying that he married Cora Lee Collins in 1934, that he had been assaulted and threatened by J. T. Collins on several occasions; and that on the night before the homicide he upbraided his wife for her conduct with a man, whom he saw that night but did not know, related this story of happenings on the night before and at the time of the homicide: "I shaved and went back to my wife's father's house. They were all sitting on the porch. When I sat down on the porch, J. T. got up and went through the house and asked what was that I put in the water bucket. I told him I had not been in the house. J. T. had a double-barrel gun and I told him I had not been in the house. I was pleading for my life, and his sister told him that I had not been in the house and was pleading for my life. His sister took it away from him and later on that night they went to bed. I stayed on the porch until about 3 o'clock. J. T. took the gun in the room with him and slept with it across his bed. I was frightened and did not sleep. The next morning my wife asked me to come to the *Page 43 
peach farm where she was so that we might talk this thing over, and the next morning I went to the peach orchard where they were. I admit being afraid of J. T. I went there with the intention of apologizing to J. T. and to get my wife so that we could live together. I didn't go there with the intention to kill or hurt anybody. I had never had that in mind. . . . When I got to the farm J. T. asked me if I wanted a job. I told him there was not enough to pick. I said: `J. T., I come to apologize to you about drawing a gun on me.' He said, `Tonight you won't only get it drawn on you, you will get shot.' I was afraid of him, to tell you the truth about it. I grabbed him with this hand (indicating). He ran his right hand in his pocket and made a swipe at my neck with a knife. I grabbed his hand and he split my finger. . . . When he cut me on the finger, I cut him. When I looked around, my wife was coming at me with a peach bag drawing back like that (indicating). I do not know whether she meant to hit me or not. At that time I guess I was a little madder than I should have been. I don't know how many times I cut her — and then I went on down the road and sat down. I went . . . and got a cloth and wrapped my thumb up." Then on cross-examination, defendant continued: "I have been cooking . . . in Greensboro . . . I came back with the intention to take my wife. Me and my wife had a big argument the night before and I slept across the bed. She left the house about 8 o'clock and I left . . . about 10 o'clock. She didn't strike me with anything, but when I turned around, she was in arm's reach with a peach bag drawed back. . . . I got the knife on the porch at Robert Collins' (father of Cora Lee, at whose home he had spent the night), . . . I was not drinking. I am right-handed and the only wound J. T. inflicted on me was a nip on my left thumb. When I grabbed J. T. in the breast he ran his hand in his right-hand pocket and had a switch-blade knife and made a sweep at me. I took this hand and blocked the knife. J. T. weighed about 160 pounds . . . I weigh 190 pounds. I am about 6 feet 2 inches tall and J. T. was about 5 feet 10 inches."
Sheriff Bruton, recalled as witness for defendant, stated: "At the time I took the defendant in custody he had a cut on his hand. I brought him to Troy and got Dr. Harris to fix it up," and defendant testified that "Dr. Harris put four stitches in it."
When the case was called for trial it appeared that defendant had issued subpoenas to Hoke County for two men, and to Scotland County for another, by whom he proposed to show his good character, and a subpoena to Scotland County for Ben Leach, "who would be offered for the purpose of showing threats made for this defendant's life by J. T. Collins, one of the deceased, and also to corroborate the defendant's testimony that defendant on one occasion came to Ben Leach's home *Page 44 
stating that he wanted to spend some time and get away from J. T. Collins, who was threatening to kill him." Whereupon, the solicitor stated that he would admit the witnesses, if present, would testify that the defendant's character was good, and that Ben Leach, if present, would testify in corroboration with the defendant's statement, "without admitting the truth of any statement made by any other witness." Thereupon, it appearing that subpoenas were issued for the witnesses referred to a week before the date of trial, and that the defendant had been in custody since 24 July, the court declined to grant a continuance. Exception No. 1 by defendant. And before the close of defendant's case, the court specifically and in detail instructed the jury in accordance with the agreement of the solicitor — that the jury should consider that the witnesses had so testified, and that the jury should consider same as evidence for defendant just as if the witnesses had been present and testified in court. This constitutes defendant's Exception No. 4.
Verdict: "That the defendant is guilty of murder in the first degree in both counts."
Judgment: In case in which defendant was "indicted, tried and convicted . . . of the murder in the first degree of one Carrie Lee Utley": Death by asphyxiation.
In case in which defendant was "indicted, tried and convicted . . . of the murder in the first degree of one J. T. Collins": Death by asphyxiation.
Defendant appeals therefrom to Supreme Court, and assigns error.
Careful consideration of the several exceptive assignments, upon which defendant relies on this appeal, fails to show cause for disturbing the judgments in the trial below.
The first assignment relating to the refusal of the court to grant motion for continuance on account of absence of material witnesses, and the fourth relating to the court stating to the jury the agreement that the jury should consider as evidence what the absent witnesses would testify, if present at the trial, may be considered together. Defendant contends that although generally the matter of a continuance is addressed to the sound discretion of the court, the refusal of continuance in this case denied to him his constitutional right in a criminal prosecution to be informed of the accusation against him and to confront his accusers and witnesses with other testimony. North Carolina Constitution, Article I, section 11. He relies upon S. v. Whitfield, 206 N.C. 696, *Page 45 175 S.E. 93, 293 U.S. 556, 55 S.C. 658, 79 L.Ed., 658, where denial of petition for writ of certiorari is recorded, of which notation appears in207 N.C. 878. In that case it is stated that "the rule undoubtedly is, that the right of confrontation carries with it not only the right to face one's `accusers and witnesses with other testimony' (sec. 11, Bill of Rights), but also the opportunity fairly to present one's defense"; . . . that "a right observed according to form, but at variance with substance, is a right denied," citing cases, among others, Powell v. Alabama,287 U.S. 45; and "that a reasonable time for the preparation of a defendant's case should be allowed counsel appointed by the court to defend him commends itself, not only as a rule of reason, but also as a rule of law, and is so established by the decisions." But, continuing, the Court there said: "On the other hand, it is equally well established in this jurisdiction that a motion for a continuance is addressed to the sound discretion of the trial court, and its ruling thereon is not subject to review on appeal, except in a case of manifest abuse," citing S. v. Lea,203 N.C. 13, 164 S.E. 736; S. v. Banks, 204 N.C. 233, 167 S.E. 851, and other cases.
Applying these principles to the case in hand, we cannot say, as a matter of law, that, in denying the motion for continuance, the court took from defendant his constitutional right of confrontation. To the contrary, it appears that the court, through the agreement of the solicitor, went far in giving defendant the benefit of what the absent witnesses would have testified if present. In absence of a clear showing of error, the exception must be overruled. See S. v. Whitfield, supra, and cases cited.
Exception is taken to the ruling of the court in sustaining objection by State to this question asked the witness Ross: "Did you ever hear J. T. Collins threaten the life of the defendant?" If this question were proper, the record fails to show what the witness would have answered. Hence, the ruling of the court must be sustained, as no error is shown. S. v. Thomas,220 N.C. 34, 16 S.E.2d 399, and numerous other cases.
Other assignments relates to the charge.
The court, in defining murder in the first degree, murder in the second degree, and manslaughter, instructed the jury that "it is the law of this State,. . . that where one admits or it is proven that he has killed another with a deadly weapon, then that raises presumption of murder in the second degree, that is, it raises a presumption that one has killed unlawfully and that it was done with malice, and from there on, to create murder in the first degree, the State must establish premeditation and deliberation. To create manslaughter, the defendant, not the State, has the burden of showing that there was no malice, in which event it is *Page 46 
reduced to manslaughter; and if he would be entirely absolved, he must go further and establish that the killing was not unlawful, that is, that it was done in self-defense."
Defendant challenges the correctness of the last sentence of this instruction, that is, the sentence beginning with the words "To create manslaughter," contending that under the law defendant has no such burden, and citing as authority the case of S. v. Howell, 218 N.C. 280,10 S.E.2d 815. The Howell case, supra, is distinguishable from case in hand in factual situation. There the defendant, upon being arraigned, entered a plea of not guilty, and did not testify in his own behalf or offer any other witness. The law as discussed there must be read in the light of the facts in that case. "The law discussed in any opinion is set within the framework of the facts of that particular case." Barnhill, J., in Light Co. v. Moss,220 N.C. 200, 17 S.E.2d 10. In the present case, while he pleaded not guilty, defendant testified in his own behalf and stated that when J. T. Collins "cut me on the finger, I cut him," and that "when I looked around my wife was coming at me with a peach bag, drawing back like that. . . . At that time I guess I was a little madder than I should have been. I don't know how many times I cut her." Moreover, it is not contended that J. T. Collins and the wife of defendant did not die as result of the wounds intentionally inflicted by defendant with a butcher knife; nor is there any contention that the deaths were accidental. On the contrary, defendant pleads self-defense.
Murder in the first degree is the unlawful killing of a human being with malice and with premeditation and deliberation. Murder in the second degree is the unlawful killing of a human being with malice, but without premeditation and deliberation. Manslaughter is the unlawful killing of a human being without malice and without premeditation and deliberation. These definitions of murder in the first degree, murder in the second degree and manslaughter are too firmly imbedded in the law to require citation of authority. Moreover, the law is well established in this State that the intentional killing of a human being with a deadly weapon implies malice, and, if nothing else appears, constitutes murder in the second degree. And when this implication is raised by an admission or proof of the fact of an intentional killing, the burden is on the defendant to show to the satisfaction of the jury facts and circumstances sufficient to reduce the homicide to manslaughter or to excuse it. S. v. Capps, 134 N.C. 622,46 S.E. 730; S. v. Quick, 150 N.C. 820, 64 S.E. 168; S. v. Benson,183 N.C. 795, 111 S.E. 869; S. v. Gregory, 203 N.C. 528,166 S.E. 387; S. v. Keaton, 206 N.C. 682, 175 S.E. 296; S. v.Terrell, 212 N.C. 145, 193 S.E. 161; S. v. Robinson, 188 N.C. 784,125 S.E. 617; S. v. Mosley, 213 N.C. 304, 195 S.E. 830; S. v. Debnam,222 N.C. 266, 22 S.E.2d 562. *Page 47 
In the Keaton case, supra, the rule is stated in this manner: "If a defendant who has intentionally killed another with a deadly weapon would rebut the presumption arising from such showing or admission, he must establish to the satisfaction of the jury the legal provocation which will take from the crime the element of malice and thus reduce it to manslaughter, or which will excuse it altogether on the ground of self-defense, unavoidable accident or misadventure."
Therefore, when in the light of these principles, applied to the facts in the present case, that portion of the charge to which the exception relates, is read in connection with that which immediately precedes, there is no error. "An exception of this sort must be considered in connection with the entire charge and is not to be determined by detaching clauses from their appropriate setting," Adams, J., in S. v. Ellis, 203 N.C. 836,167 S.E. 67. "The charge is to be construed contextually," Stacy, C. J., in S. v. Grass, ante, 31, citing S. v. Lee, 192 N.C. 225, 134 S.E. 458.
Applying this principle to the present case it is true that, in that portion of the charge immediately preceding that to which the exception is directed, the word "intentionally" does not appear before the word "killed" in the clause "that where one admits or it is proven that he has killed another with a deadly weapon," upon which the presumption of murder in the second degree arises. But, as the correctness of the portion to which exception is taken is predicated upon that which precedes, that which precedes must be a correct charge. Nevertheless, as it is not here contended that the deaths of the deceased persons were accidental, and as defendant admits the cutting and resultant deaths, and pleads self-defense, that the cutting was intentional is apparent, and, hence, there is no error, S. v. Debnam, supra, for which a new trial can be ordered.
There are other exceptions to excerpts from the charge, which standing alone may be subject to challenge, but, as in the foregoing, when severally read in connection with the portion of the charge immediately preceding, or immediately following, each, as, the case may be, that is, construed contextually, they are free from error. To treat them seriatim would be mere repetition.
It is proper to point out, however, that, while no objection is taken, and no exception is directed thereto, a discrepancy appears upon the face of the record. In case Number 731 defendant is charged with the murder of one Cora Lee Utley, and the judgment in that case reads, "James Utley, you have been indicted, tried and convicted by a jury of your county of the murder in the first degree of one Carrie Lee Utley, etc." Nevertheless, the evidence in the record shows that the real name of the murder woman, wife of defendant, is Cora Lee Utley as named in the *Page 48 
indictment. Furthermore, the record shows that the court, in its charge to the jury, referring to the indictment and to the evidence, gives her name as Cora Lee Utley. And the verdict of the jury is "that the defendant is guilty of murder in the first degree in both counts" — one of the counts being the charge of the murder of one Cora Lee Utley. Manifestly, there is no uncertainty in the identity of the person. Therefore, the name as used in the judgment comes within the rule of idem sonans and is not a fatal variance. For cases in which, upon identity being established, the principle has been applied in this State, see S. v. Upton, 12 N.C. 513, "Anne" and "Anny"; S. v. Patterson, 24 N.C. 346, "Deadema" and "Diadema";S. v. Houser, 44 N.C. 410, "William Michaels" and "William H. Michal"; S.v. Johnson, 67 N.C. 55, "Susan," "Susanna" and "Susie"; S. v. Lane,80 N.C. 407, "J. B. Runkins" and "J. B. Rankin," and "Dulks Helker" and "Helker Duts"; S. v. Covington, 94 N.C. 913, "Hawood" and "Haywood"; S.v. Hare, 95 N.C. 682, "Willis Fain" and "Willie Fanes"; S. v. Collins,115 N.C. 716, 20 S.E. 452, "Major Vass" and "Major Vase"; S. v. Hester,122 N.C. 1047, 29 S.E. 380, "Thomas R. Robertson" and "Thomas Robertson"; S. v. Drakeford, 162 N.C. 667, 78 S.E. 308, "Lila Hatcher" and "Liza Hatcher"; S. v. Chambers, 180 N.C. 705, 104 S.E. 670, misspelling of Tolbert; S. v. Donnell, 202 N.C. 782, 164 S.E. 352, "R. B. Andrews" and "R. B. Andrew"; S. v. Whitley, 208 N.C. 661,182 S.E. 338, "Cannon Mills Company" and "Cannon Mills"; S. v.Dingle, 209 N.C. 293, 183 S.E. 376, "Gernie Williams" and "Germie Williams"; S. v. Reynolds, 212 N.C. 37, 192 S.E. 871, "Oakes Clement" and "Okes Clement"; S. v. Vincent, 222 N.C. 543, 23 S.E.2d 832, "Vincent" and "Vinson."
The setting under which the homicides were committed, as revealed by the evidence, lends little, if any, support to defendant's plea of self-defense. Yet the court fairly presented the question, and gave to defendant full benefit of the principle. The jury, however, were not satisfied, and rejected the plea. Moreover, there is strong evidence to support the verdicts of murder in the first degree. No reversible error appears on this record. Hence, in the judgment below we find.
No error. *Page 49