STATE v. JAMES EDWARD WILLIAMS.

(Filed 3 February, 1967.)

1. **Homicide § 20— Circumstantial evidence of defendant's guilt of murder held sufficient to be submitted to jury.**

The evidence tended to show that defendant and deceased had had an altercation, that on the night in question they left a roadhouse in a car driven by defendant, that shortly thereafter deceased's lifeless body was found on the highway not far distant with a pistol wound causing death, that a spent .38 caliber bullet was found in defendant's car, that the bullet had been fired from a .38 caliber revolver owned by defendant and found several days later in a truck at defendant's home, etc. *held* sufficient to be submitted to the jury and to sustain a verdict of guilty of murder in the second degree.

2. **Criminal Law §§ 71, 155— Ordinarily, defendant failing to object to admission of testimony may not challenge its admissibility for the first time after an adverse verdict.**

It appeared that defendant, who was seen with deceased shortly before her death, voluntarily went to the police station shortly after her death, ostensibly to tell what he knew that might be of assistance in the investigation of the homicide, and that defendant made statements to the effect that an unknown person had dragged the deceased from the car and robbed defendant of his pocketbook. Defendant was not taken into custody until later when his ·pocketbook had been found in his car. *Held:* Testimony of defendant's statement was competent, and certainly its admission in evidence in the absence of objection by. defendant was not prejudicial. *Miranda v. Arizona,* 384 U.S. 436, having been decided subsequent to trial is not applicable; *Escobedo v. Illinois,* 278 U.S. 478, does not require the trial court *sua sponte* to exclude testimony of a statement volunteered by defendant at the outset of an investigation.

3. **Searches and Seizures § 1; Criminal Law §§ 79, 162—**

Defendant may not object to the introduction of articles found in his car in a search made with defendant's express permission. Further, the admission of the exhibits in evidence will not be held error when there is no reasonable ground to believe that the exhibits themselves, as distinguished from evidence in regard thereto admitted without objection, were prejudicial.

4. **Criminal Law § 102—**

Where the indictment spells the victim's name as "Mateleane" while the record testimony spells her name "Madeleine", the variance comes within the rule of *idem sonans* and is not material.

APPEAL by defendant from *Bickett, J.,* May 1966 Session of CHATHAM.

Defendant, "James Edward Williams, alias Jesse Williams," was indicted for the first degree murder of "Mateleane Martin Bland" on or about December 25, 1965, in Chatham County. At the trial, the only evidence was that offered by the State. In the evidence, as appears in the record, the first name of the deceased is spelled Madeleine.

The State, which bases its case on circumstantial evidence, offered evidence tending to show the facts summarized, except when quoted, below.

Madeleine and her husband, Sam Bland, had separated; and for about three months she had lived in the home of Willie Robert Hill. Hill's wife and Madeleine were sisters. A driveway separated the Hill house from the Martin house where Madeleine's parents and her 15-year-old brother, Glysten Martin, then lived. Near these houses, on the same dead-end dirt road, was a frame building known as the Greasy Spoon. Originally a small dwelling, this building now contained a dance hall, a pool room and a place where "(s)ometimes they sell something to eat."

It was approximately a quarter of a mile along said dirt road from the Greasy Spoon to the paved road (RPR No. 2135) from Goldston to Gulf. Margaret McLeod lived half-way between the Greasy Spoon and the Goldston-Gulf Road.

On Christmas Eve, December 24, 1965, about 11:40 p.m., defendant's 1965 4-door Ford was in front of the Greasy Spoon. Madeleine and defendant were the only occupants. Madeleine was under the steering wheel and backed it out of the yard. Defendant was sitting beside her.

John Cotton started home from the Greasy Spoon about 12:30 Christmas morning. When he reached the paved road and turned left towards Gulf, he saw Madeleine lying, flat on her back, on the right shoulder. Her coat was spread over her stomach and her pocketbook was lying on top of the coat. He did not examine her to determine whether she was living or dead. Instead, he drove back to the Greasy Spoon and there got three others, including Brown Horton, to go back with him. They went to the home of Margaret McLeod, the mother of Brown Horton, woke her up, told her that Madeleine was dead, requesting that she go to her father's "to call the Sheriff's Department." Earlier, Margaret McLeod, whose house was some distance back from said dirt road, had observed a car traveling along said dirt road from the Greasy Spoon towards said paved road and had heard a noise, different from any other noise she heard theretofore or thereafter, which sounded like a firecracker

or a gun or possibly the backfiring of a car. She had heard this noise after "the news went off at 11:15."

John W. Emerson, Jr., Sheriff of Chatham County, and Dr. Robert Jakes, Medical Examiner of Chatham County, arrived in the area on Christmas morning about 2:00 or 2:30. Madeleine was dead. Her body was approximately seventy-five feet from the junction of said dirt road and said paved road. Her feet were just about even with the pavement and her head was towards the ditch. She had on the blue sweater identified as Exhibit 3. A top coat was lying across her body and on top of it was a lady's handbag. A photograph was taken before they "bothered anything." Upon examination of the body they "found blood and a bullet wound in the breast, not quite in the center but a little to the right." The body was removed to Griffin's Funeral Home in Pittsboro where Dr. Jakes, an admitted medical expert, about 3:30 a.m., performed an autopsy.

The autopsy disclosed one wound made by the penetration of a bullet of medium caliber, which entered the chest, went through the heart and "exited" in the lower left lumbar region. This bullet wound was the cause of death. There were "definite powder burns" in the brassiere on the body. In the opinion of Dr. Jakes, "the gun was discharged from 6 to 12 inches from the body."

On Christmas morning defendant, accompanied by one of his brothers, drove his 1965 Ford into the yard at Hill's house. Defendant asked, "was it true about Madeleine being dead," and Hill told him she was dead. That is all defendant said.

Sheriff Emerson first saw defendant on Christmas morning between 3:45 and 4:00. Defendant and his brother were in the lobby of the Police Station in Sanford (Lee County). He talked with them "for not over 10 to 15 minutes." After getting defendant's version of what had happened (set out below) they "left Sanford." Sheriff Emerson, taking defendant with him, went back "to the Goldston vicinity." Later, he took defendant to Pittsboro where defendant was lodged in the Chatham County Jail between 5:30 and 6:00 on Christmas morning. Meanwhile, Sheriff Emerson had given the keys to defendant's car to his deputies with instructions to bring it from Sanford to Pittsboro.

In talking with Sheriff Emerson, defendant told him in substance, except when quoted, the following: During the afternoon of December 24, 1965, he and Madeleine had gone to a Drive-In Theatre in or near Siler City. Afterwards they went to the Greasy Spoon. Leaving the Greasy Spoon, they traveled said dirt road. When they came to the stop sign at said paved road, "someone appeared at the right door of his automobile and there jerked Made-

leine Bland out of the automobile and then made some ugly statements to him that he was the one that had been running around with his wife." He had not seen anyone before he stopped, at the stop sign. The man, whom "he couldn't see him enough to tell who it was," had on a black raincoat. When the man told him to come around, he got out, came around and the man robbed him, taking his pocketbook in which he had approximately $20.00. Thereafter he got in his car, turned left towards Gulf, went to Gulf, then to Sanford, from Sanford to the home of his brother, Lamont Williams, and from there returned to said dirt road and entered the driveway between the Hill house and the Martin house. From the time of the incident at the junction of said dirt road and said paved road involving Madeleine, he saw no person except his brother until he saw Hill. He told his said brother that "he'd had some trouble up there and he wanted him to go back with him up there."

At the Police Station in Sanford, Sheriff Emerson, with the express permission of defendant, made a hurried examination of defendant's car. He opened the right-hand front door, ran his hand along the seat between it and the back as far as he could reach, and about a foot from the edge of the seat he found a man's wallet. "It contained the defendant's name and about $10.00 in money." He also found under the right front seat "an Italian made .22 caliber pistol, automatic." He locked the car. The car was brought to the jail in Pittsboro about daybreak. Deputy Sheriff Farrell made a further examination thereof about noon on Christmas day. He found "a .38 slug," identified as Exhibit 2, on the front seat. "It was pushed down on the driver's side . . . between the cushion and the back."

On December 29, 1965, Sheriff Emerson went to the home of defendant, in Lee County about five to seven miles below Sanford. On this occasion, he was accompanied by the Sheriff of Lee County and two of his deputies and also by a deputy sheriff of Chatham County. He was talking to defendant's wife when Sheriff Holder of Lee County called him. The gun identified as State's Exhibit 1 "was found in a paper sack under the front seat of a truck parked right behind and about 8 or 10 feet from the defendant's house." It was not loaded.

A witness testified Exhibit 1 looked "just like the .38 caliber revolver" defendant had purchased from him in 1965. Another witness testified that, in the summer of 1965, when defendant showed him, a prospective purchaser (who did not buy), "a .22 pearl-handled pistol," he also showed him "a nickel plated bone-handled .38 revolver" that looked like it was "the same one" as Exhibit 1.

Exhibits 1, 2 and 3 were examined by S.B.I. experts. A ballistics expert testified Exhibit 1 was "a .38 caliber Smith & Wes-

son revolver" and that Exhibit 2 was "a .38 caliber spent bullet." In his opinion, "this bullet (Exhibit 2) was fired from this weapon (Exhibit 1)"; that a bullet hole in the upper right mid-section of the blue sweater (Exhibit 3) was that of "a .38 caliber bullet"; and that, based on tests he had made and described, the weapon was fired at a distance of approximately six inches from where the bullet penetrated the sweater.

An expert in the field of analytical chemistry testified he found blood on Exhibit 2; that he found "microscopic spatters of blood on the barrel and hand grip area above the cylinder" of Exhibit 1; and that he was unable to tell the age of the blood or whether it was human blood. This witness, based on his examination on December 28, 1965, of defendant's 1965 Ford, testified: "I found on the front seat, on the right-hand side, and about 4 to 6 inches above the seat, a trail or smear of blood extending from approximately the center across the seat to the right-hand side of the car. And on the door post a hair and trace of blood at the same level as the smear across the back of the seat. I also found on the left-hand side of the car a hand or finger print, five finger prints in which the second and third fingers were very clear and the others were smeared bloody prints. There were traces of blood on the steering wheel and also some very small traces on the head liner at the top of the automobile. An amount of blood on the right front seat was of sufficient quantity to identify it as human blood."

Prior to the departure of Madeleine and defendant from the Greasy Spoon about 11:40 on Christmas Eve, the following had occurred:

Claude Horton first observed defendant at the Greasy Spoon about 9:15. Defendant was in his car under the steering wheel. Later he talked with defendant inside the Greasy Spoon. Earlier that night, at a barber shop in Sanford, he and defendant had spoken of Sam Bland, Madeleine's husband. Defendant asked Horton if Sam was at home and stated he was going to Goldston because Sam owed him some money. Two or three weeks earlier Horton had been on a house party with Madeleine and defendant at Goldston. Horton testified: "On the night at the Greasy Spoon the defendant told me that if I saw him and Madeleine having trouble, I was not to have anything to do with his business, with his or her affairs. What he was talking about was that a week or two before I saw him and Madeleine have a kind of 'sputterment,' something like an argument. He was not hurting her. What he told was that if I saw them having trouble, not to stick my nose in it."

When Glysten Martin got to the Greasy Spoon about 10:30, defendant walked out of the kitchen, went to the window where Made-

leine was standing, and Madeleine and defendant "stood there talking at the window." Martin heard defendant say: "I don't give a damn if your brother is in there." After defendant made this statement, Madeleine tried to get him to leave. He gave her the key to his car and she went out and started the car. Soon thereafter Madeleine came back in the Greasy Spoon, got defendant and told him, "let's go." She got defendant by the arm and they went on out together.

When Tommy Rives got to the Greasy Spoon about 11:30, defendant's car was in the yard. Madeleine was under the steering wheel and defendant was on the right front seat. Defendant had his hand on Madeleine's chest up at her throat and said: " 'You'll feel sorry for it' or something; 'You'll really hate it,' or something like that." Later, when he saw them leaving, Madeleine was driving the car towards said paved road.

The jury returned a verdict of guilty of murder in the second degree; and the court pronounced judgment that defendant be imprisoned for a term of not less than twelve nor more than twenty years. Defendant excepted and appealed.

*Attorney General Bruton and Deputy Attorney General McGalliard for the State.*

*Harry P. Horton and George M. McDermott for defendant appellant.*

BOBBITT, J. Defendant assigns as error the denial of his motion for judgment as of nonsuit, contending the State's evidence "at most raises mere suspicion and conjecture of (defendant's) guilt."

There was ample evidence to warrant, although not compel, these findings: Madeleine's death was caused by a .38 caliber bullet fired at a distance of from six to twelve inches; that a spent .38 caliber bullet (slug) was found in defendant's car soon after Madeleine's lifeless and deserted body was found on the shoulder of the highway; that the .38 caliber bullet had been fired from the .38 caliber Smith & Wesson revolver owned by defendant and found several days later in a truck at defendant's home; that there was blood on the spent bullet, the revolver and the front seat of defendant's car; that Madeleine, when last seen alive, was with defendant in the area where her body was found; that a week or so prior to Christmas Eve Madeleine and defendant had had a "sputterment" and defendant had warned Horton not to interfere if he saw Madeleine and defendant "having trouble"; and that, at the Greasy Spoon shortly before Madeleine's death, defendant had spoken to her sharply and in terms of threat or warning. In addition, Sheriff

Emerson's testimony as to finding the wallet containing defendant's name and $10.00 in defendant's car would seem in conflict with what defendant told him about being robbed by an unknown man in a black raincoat.

When tested by the rule of this jurisdiction in respect of the sufficiency of circumstantial evidence to warrant submission of a criminal case to the jury, stated by Higgins, J., in *S. v. Stephens,* 244 N.C. 380, 93 S.E. 2d 431, and approved in numerous subsequent decisions, *S. v. Roux,* 266 N.C. 555, 562-563, 146 S.E. 2d 654, 659-660, and cases there cited, the evidence, when considered in the light most favorable to the State, 1 Strong, N. C. Index, Criminal Law § 101, was sufficient to warrant submission of the case to the jury and to sustain the verdict.

Defendant contends the court erred in admitting the testimony "of the investigating officer" as to "incriminating statements" allegedly made by defendant to said officer "before defendant was advised of his right to remain silent and at a time when defendant was not represented by counsel." The investigating officer was Sheriff Emerson. At trial, no objection was made to any portion of his testimony as to what defendant had told him early Christmas morning in the course of his investigation of the homicide. In his statement of case on appeal, defendant's counsel, for the first time, challenges the admissibility of this portion of Sheriff Emerson's testimony. In the only portion of the charge to which defendant excepts, the court, in referring to this testimony, clearly implies that defendant was *then* contending before the jury that Madeleine was taken from defendant's car and that defendant himself was robbed in the very manner defendant had reported to Sheriff Emerson. Defendant's counsel did not object to or protest this interpretation by the court of defendant's contention. Whether the admission of this testimony was favorable or unfavorable to defendant need not be determined. Absent this testimony, the only contention available to defendant, unimpressive under the circumstances, was that the State's evidence was insufficient to warrant conviction. Frequently defendant's counsel must consider whether the admission or the exclusion of testimony proffered by the State would be more favorable to his client. Absent extraordinary circumstances, a defendant cannot obtain whatever benefit may accrue to him from the admission of testimony without objection and in the event of an adverse verdict challenge for the first time the admissibility of such testimony.

Defendant cites *Miranda v. Arizona,* 384 U.S. 436, 16 L. Ed. 2d 694, 86 S. Ct. 1602. However, in *Johnson v. New Jersey,* 384 U.S. 719, 16 L. Ed. 2d 882, 86 S. Ct. 1772, it was held that *Miranda* was applicable only to cases in which the trial began after June 13,

1966, the date the decision in *Miranda* was announced. Defendant having been tried and convicted prior to June 13, 1966, *Miranda* does not apply and need not be considered in connection with defendant's appeal.

*Escobedo v. Illinois,* 278 U.S. 478, 12 L. Ed. 2d 977, 84 S. Ct. 1758 (1964), although applicable to trials conducted at said May 1966 Session, did not require the trial judge, either on objection or *sua sponte,* to exclude Sheriff Emerson's testimony as to the statement made to him by defendant at the outset of his investigation of the homicide.

The evidence is silent as to defendant's actions between his appearance with his brother at the Hill house and their appearance in the lobby of the Police Station in Sanford. There is no evidence defendant had been arrested prior to the arrival of Sheriff Emerson. Apparently, defendant, who, according to all the evidence, had been with Madeleine at the Greasy Spoon until nearly midnight, had gone to said Police Station to report the circumstances under which he and Madeleine separated. There is no evidence of prolonged interrogation, duress, inducements, etc. On the contrary, what defendant, in the presence of his brother, told Sheriff Emerson, if it were true, completely absolved defendant from guilt in connection with Madeleine's death. Nothing indicates defendant was taken into custody by Sheriff Emerson until after the sheriff had examined defendant's car and had found a wallet containing defendant's name and $10.00 and also a .22 caliber pistol. The fact that this wallet and its contents were in defendant's car indicated strongly that defendant's statement, particularly the portion thereof to the effect he had been robbed of his pocketbook containing $20.00, was false.

True, there is no evidence to the effect the sheriff warned defendant in respect of his constitutional right to counsel, to remain silent, etc., before defendant made his statement as to what had occurred. No questions were asked either by the prosecuting attorney or by defense counsel bearing upon whether defendant was so advised. Defendant made no request that he be permitted to confer with counsel. It does not appear that defendant was charged with homicide or in custody when he talked with Sheriff Emerson in the lobby of the Police Station in Sanford. It would appear that defendant, accompanied by his brother, went to the Police Station in Sanford ostensibly for the purpose of telling what he knew that would or might be of assistance in the general investigation of a homicide. Under these circumstances, the testimony *now* challenged was competent; *a fortiori,* its admission *without objection* was not prejudicial error.

Defendant contends the court erred in admitting into evidence the State's exhibits.

None of these exhibits has been brought to this Court as a part of the record on appeal. They are identified in the evidence as follows: Exhibits 1, 2 and 3 are the .38 revolver, the .38 slug, and the sweater, respectively. Exhibit 4 is a piece of paper identified by the ballistics expert as used in his tests. Exhibit 10 is the wallet. Exhibit 11 is the .22 pistol. Remaining exhibits are photographs admitted to illustrate the testimony of certain witnesses.

No objection was made when the testimony concerning these exhibits was offered. Near the conclusion of the evidence, the State offered Exhibits 1 through 12 and defendant objected to these exhibits "being accepted into evidence." The court inquired: "On what grounds?" Counsel for defendant answered: "No reason at this time."

The contention now made is that, notwithstanding the preliminary search of defendant's car by Sheriff Emerson was made with defendant's express permission, the legality of this and later searches was nullified by the fact there is no evidence Sheriff Emerson, prior or subsequent to the preliminary search, advised defendant of his constitutional rights in respect of searches and seizures. *Miranda* is the only decision cited by defendant to support this contention.

With reference to the preliminary search by Sheriff Emerson in Sanford: "Where the person voluntarily consents to the search, he cannot be heard to complain that his constitutional and statutory rights were violated." *S. v. McPeak,* 243 N.C. 243, 90 S.E. 2d 501, cert. den. 351 U.S. 919, 100 L. Ed. 1451, 76 S. Ct. 712; *S. v. Hamilton,* 264 N.C. 277, 141 S.E. 2d 506. Whether the search of defendant's car at Pittsboro or the search of the truck at defendant's home in Lee County were by permission, under search warrants or otherwise legally permissible does not appear. No inquiry was made or requested with reference thereto. The evidence fails to show these exhibits or any of them should have been excluded. In any event, there is no reasonable ground to believe that the exhibits themselves, as distinguished from evidence admitted without objection with reference thereto, were prejudicial to defendant.

Defendant makes no contention with reference to the variance between the spelling of the first name of the victim in the indictment, "Mateleane," and the spelling of her name in the testimony, "Madeleine." There is no uncertainty as to her identity. The variance comes within the rule of *idem sonans* and is not material. See *S. v. Utley,* 223 N.C. 39, 48, 25 S.E. 2d 195, 202, and cases cited.

The record leaves the impression that defendant was treated with fairness and consideration during the investigation and at all

stages of his trial. There being no prejudicial error, the verdict and judgment will not be disturbed.

No error.