## STATE v. BOGGAN.

(Filed December 19, 1903.)

1. DYING DECLARATIONS—*Evidence.*

> The facts of this case make the dying declarations of the deceased competent.

2. HOMICIDE—*Evidence—Murder—Manslaughter.*

> The evidence in this case is sufficient to justify the refusal of the trial judge to instruct the jury that there was no evidence of murder in the first degree, or second degree, or manslaughter.

3. JURY—*Improper Conduct—New Trial.*

> The fact that a jury had an opportunity to see the locality where the homicide is alleged to have been committed and there is no evidence that any remarks were made among the jurors themselves or the officer attending them as to the condition and appearance of the place, is not sufficient to justify the granting of a new trial, the trial judge having declined to set aside therefor a verdict of guilty.

MONTGOMERY, J., dissenting.

INDICTMENT against Will Boggan, heard by Judge *C. M. Cooke* and a jury, at September Term, 1903, of the Superior Court of ANSON County. From a verdict of guilty and judgment thereon the defendant appealed.

*Robert D. Gilmer, Attorney-General,* for the State.
*H. H. McLendon,* for the defendant.

CONNOR, J. The prisoner was convicted of murder in the first degree and from the judgment of the Court appealed. The facts material to the decision of the exceptions set out in the record and case on appeal are as follows: On the night of February 28, 1903, the deceased met Morgan and Starnes

near the Klondyke Hotel in the town of Wadesboro.   They went into and down an alley between the hotel and store of one Williams for the horse and buggy of the deceased.   There was testimony on the part of the State tending to show that as the three persons went down the alley the prisoner was standing up beside a wall and deceased spoke to him in a friendly manner, the prisoner responding: "Hello, you d—— son of a b——."   Deceased said "I do not like to take that off of no man," and made an attempt to turn around.   The other two persons with him prevented him from doing so, and the three started on down the alley.   Prisoner followed them. One of the witnesses swore that he saw a pistol in prisoner's hand; that he turned deceased loose and started around the corner by the store; that he looked back and saw prisoner with pistol in his hand, arm outstretched, presenting it toward deceased, and he said: "I will break it off in you, you d—— son of a b——."   That he then saw the pistol fire.   The prisoner turned and ran up the alley-way.   Witness went to deceased and asked him if he was hit, and he said: "That negro has killed me."   The witness said: "Boggan followed Sullivan, after using the words, ten or fifteen feet before he shot.   He was about four or five feet from Sullivan when he shot him."   The witness Starnes further testified: "I looked back and saw the negro following.   I turned and told him to go back.   He said: 'I'll be d—— if I do.'   Just about that time Sullivan stepped around me and said: 'I do not like to take that.'   The negro said: 'I gave it to you and I'll be d—— if I take it back; before I will I will break it off in you.' Sullivan pulled off his right glove and went to put it in his pocket, and as he did so the negro shot him."   There was other testimony in regard to the identity of the prisoner.   The prisoner set up an *alibi* and introduced testimony tending to sustain his contention that he was at another place at the time of the homicide.   The deceased was shot on Saturday

night and died the following Tuesday. Dr. Bennett and Dr. Ashe saw him on Sunday morning. "He was then rational and very much composed." Doctors told him that the wound would very probably prove fatal. They extended some hope to him by means of an operation that might save him. They told him that they were preparing for statement he might make to the magistrate. Prisoner objected to this testimony; objection overruled. No statement by the prisoner was introduced.

Julius Sullivan, a brother of the deceased, was introduced and testified that he saw the deceased about 3 :30 o'clock Monday morning. To an enquiry as to his condition deceased said: "I am in a bad fix." About 9 o'clock that morning deceased sent for witness and said: "Well, I am about to leave you all; I hate to leave my little children." Witness then asked him if he knew who shot him. He said: "Yes, I know who shot me; Will Boggan shot me. I have been knowing him all my life." Prisoner duly objected and excepted to the admission of this testimony. Daniel Crawford also testified to similar declarations of deceased made about the middle of Monday afternoon. Before making the statement as to who shot him deceased said: "I am getting weaker. I believe I am going to die." Witness said he hoped not. Deceased said: "Yes, he thought he was bound to die. The doctors thought he could not possibly get well." To all of which prisoner duly excepted.

The declarations of the deceased were clearly competent. Every condition upon which dying declarations are made competent were shown to exist. The ruling of his Honor is sustained by a long and uniform current of decisions of this Court. *State v. Dixon,* 131 N. C., 808.

We have examined the other exceptions to the admissions of testimony. We concur with his Honor in respect to them.

The prisoner requested his Honor to charge the jury:

STATE *v.* BOGGAN.

"That upon the evidence the jury cannot find a verdict of murder in the first degree." This was declined, and prisoner excepted. His Honor could not properly have given the instruction. According to the decisions of this Court, there was ample evidence, if believed by the jury, to show premeditation. Similar instructions were asked, in regard to verdict of murder in the second degree and manslaughter, and declined. The ruling upon the first prayer disposes of these. His Honor might well have given the instruction as to manslaughter, but of course the prisoner cannot complain of his failure to do so. In no possible point of view could they find the prisoner guilty of manslaughter. His Honor's charge, set out in full, is clear, exhaustive and absolutely fair to the prisoner. If there was any error the State alone had a right to complain. The real contest in the case centered upon the question of the identification of the prisoner. If the testimony of the only witnesses to the homicide is true, it was an unprovoked, heartless murder. There is no contradictory evidence in respect to the way in which the deceased was killed.

We have examined the exception to the reply made by his Honor to the question propounded by the jury after an hour's deliberation, and find no error therein.

The last exception urged by the prisoner's able and faithful counsel relates to the conduct of the jury. In respect thereto his Honor finds the following facts: "The jury, pending the trial, were quartered in the Klondyke Hotel by the officer and kept together there at night and when not attending upon the sessions of the Court; that the alley in which the shooting occurred was right on one side of the hotel, and was the nearest way from the hotel to the privy, and that on two occasions the jury were carried by the officer through the alley to reach the privy for the calls of nature. The first time was on the night after the jury was empaneled and

before any evidence was introduced. The next time was on yesterday, in the day-time, pending the argument. The Court finds that the jury did not, nor did any of them, at any other time visit or go through the alley, and that there were not any remarks made by any one of the jury, nor by the officer attending them, as to the condition or appearance of the alley, and that the jury could see and did see the alley from time to time as they passed along by it going to and returning from the sessions of the Court, but no remarks were made by them or any of them as to the conditions of the alley or appearances therein. That the jury from the hotel windows could see and did see the alley and street along which the accused was alleged to have gone after the shooting. The Court further finds that the jury could and did see the electric light and could and did see to what extent they lighted up the alley and the streets and points at which it was testified the accused was on the night of the killing, but there was no mention of any of these conditions, nor remarks made by the members of the jury to each other, nor to any one else, nor by the officer, nor any discussion by them of any of these conditions or the appearance of the place of the shooting nor any of the environments."

The prisoner, upon these findings of fact, moved the Court to set aside the verdict. Motion denied. Prisoner excepted.

In respect to motions to set aisde the verdicts of the jury for misconduct, the rule which controls this Court is thus stated by *Pearson, C. J.,* in *State v. Tilghman,* 33 N. C., 513 (p. 553): "If the circumstances are such as merely to put suspicion on the verdict, by showing not that *there was* but that there might have been an undue influence brought to bear on the jury because there was opportunity and a chance for it, it is a matter within the discretion of the presiding Judge. But if the fact be that undue influence was brought to bear on the jury, as if they were fed at the charge of the

prosecutor or prisoner, or if they be solicited and devised how their verdict should be, or if they have other evidence than that which was offered, in all such cases there has been in contemplation of law no trial, and this Court, as a matter of law, will direct a trial to be had."

This Court held in *State v. Crane,* 110 N. C., 530 : "When it appears only that there was an opportunity whereby to influence the jury, but not that the jury was influenced, merely opportunity and chance for it, a new trial is in the discretion of the presiding Judge." *State v. Miller,* 18 N. C., 500.

In *State v. Gould,* 90 N. C., 658, a capital felony, *Mr. Justice Ashe* says: "And even if the circumstances had been such (which was not the case here) as to show that there was an opportunity and chance for exerting an influence upon them, it would have been matter of discretion with the presiding Judge whether he would have granted a new trial." In this case his Honor, while properly declining to hear an affidavit from one of the jurors for the purpose of impeaching the verdict, states that he examined each of the jurors orally in the presence of the prisoner and his counsel, and the record shows that the jury was polled. The presumption is, in favor of the integrity of the jury and their verdict, that they tried the case upon the law and evidence. If it is sought to impeach the verdict, the burden is upon the prisoner to show either that they were improperly influenced or that their conduct was such that as a matter of law there had been "no trial." We construe the findings and action of his Honor to mean that the jury were not influenced in arriving at their verdict by what they saw in regard to the alley and its surroundings. We do not entertain a doubt but that the learned, just and fearless Judge who heard the case and passed upon the motion would have promptly set the verdict aside, regardless of all other considerations than his sense of duty, if he

had even doubted its integrity. We should not hesitate to de-
clare the law, as contended by the prisoner, regardless of this
consideration, if we·so found it to be. Formerly juries were
selected from the vicinage, because of their supposed famil-
iarity with the parties, witnesses and surroundings. It would
be impracticable to shut a jury up in a room without light,
air or exercise during a long trial, as in this case eight days,
to prevent the possibility of their seeing, in passing to and
from the court-house or attending a call of nature, some-
thing which might affect their minds. Many suggestions
readily occur to the mind of conditions and circumstances
which *might* affect the minds of jurors which it would be
impracticable to make the basis for setting their verdicts
aside. The law and its administration are for the practical
affairs of life. While it seeks to protect the innocent and
surround the accused in the day of his trial with all of the
safeguards which experience, humanity and justice demand,
it seeks also to deal with men and things in a practical way.

We have given the prisoner's cause a careful, anxious con-
sideration. A jury of his country has found him guilty of
an unprovoked murder of a citizen of the State. We find
no error in the action of the Court. He has been tried accord-
ing to the "law of the land." The judgment must be
Affirmed.

MONTGOMERY, J., *dissenting.* I dissent from that part of
the opinion of the Court in which it is held that his Honor
committed no error in refusing to grant the prisoner a new
trial on the ground that the jury were on several occasions
allowed to visit the locality where the homicide occurred. A
most material question of the trial was the identification of
the prisoner. Without the aid of the dying declarations of
the deceased the jury would have had difficulty in making
that identification. The homicide occurred at night in an

alley of the town of Wadesboro. Some of the witnesses testified that the light in the alley from an electric light was insufficient to disclose the identity of the prisoner; others said that the light was sufficient for that purpose. The jury were allowed, without an order of the Court and without the knowledge of the prisoner, to observe many times the effect of the light upon the point where the homicide occurred.

I am not seeking to disturb the rule, so often laid down by this Court, that it is not sufficient to set aside a verdict that a juror might have been influenced by separation from the others of the jury, or by communications held with others outside, but that there must be evidence that the juror was influenced in his verdict by such conduct. But I do intend to enter my dissent against the conviction of any person of a capital felony in a case where evidence other than that offered on trial in an open court has been received by the jury, as was done in this case.

In *State v. Tilghman,* 33 N. C., at p. 553, *Pearson, J.,* said for the Court: "We take this plain proposition: If the circumstances are such as merely puts suspicion on the verdict by showing not that there was but that there might have been undue influence brought to bear on the jury because there was opportunity and a chance for it, it is a matter within the discretion of the presiding Judge. But if the fact be that undue influence was brought to bear on the jury, as if they were fed at the charge of the prosecutor or the prisoner, or if they be solicited and advised how their verdict should be, *or if they have other evidence than that which was offered on the trial* (italics mine), in all such cases there has, in contemplation of law, been no trial; and this Court, as a matter of law, will direct a trial to be had, whether the former proceeding purports to have acquitted or convicted the prisoner."

It matters not what you may call the observations of the

jurors of the place where the homicide was committed, or for whatever purpose the jury visited that locality, the fact is the effect of those lights upon the points in that alley, which were made important by the testimony, was evidence, and it was, in the nature of things, bound to have influenced the jury in fixing the identification of the prisoner. No person can say that the lights which the jurors saw, on the nights when they were in or near the alley, were the same lights which were there the night of the homicide. And it will not do to say that the prisoner could have shown that the lights were not the same. The answer to that is that he did not know the jurors had been there making observations. That information came after the trial was over.