MONTGOMERY, J., dissenting.
The prisoner was convicted of murder in the first degree, and from the judgment of the court appealed. The facts material to the decision of the exceptions set out in the record and case on appeal are as follows: On the night of 28 February, 1903, the deceased met Morgan and Starnes near the Klondyke Hotel in the town of (762) Wadesboro. They went into and down an alley between the hotel and store of one Williams for the horse and buggy of the deceased. There was testimony on the part of the State tending to show that as the three persons went down the alley the prisoner was standing up beside a wall and deceased spoke to him in a friendly manner, the prisoner responding: "Hello, you d_____ son of a b_____." Deceased said: "I do not like to take that off of no man," and made an attempt; to turn around. The other two persons with him prevented him from doing so, and the three started down the alley. Prisoner followed them. One of the witnesses swore that he saw a pistol in prisoner's hand; that he looked back and saw started around the corner by the store; that he looked back and saw prisoner with pistol in his hand, arm outstretched, presenting it toward deceased, and he said: "I will break it off in you, you d_____son of a b_____." That he then saw a pistol fire. The prisoner turned and ran up the alleyway. Witness went to deceased and asked him if he was hit, and he said: "That negro has killed me." The witness said: "Boggan followed Sullivan, after using the words, ten of fifteen feet before he shot. He was about four or five feet from Sullivan when he shot him.' The witness Starnes further testified: "I looked back and saw the negro following. I turned and told him to go back. He said: I'll be d_____ if I do.' Just about that time Sullivan stepped around me and said: `I do not like to take that.' The negro said: `I gave it to you and I'll be d_____ if I take it back; before I will I will break it off in you.' Sullivan pulled off his right glove and went to put it in his pocket, and as he did so the negro shot him." There was other testimony in regard to the identify of the prisoner. The prisoner set up an alibi and introduced testimony tending to sustain his contention that he was at another place at the time of the homicide. The deceased was shot on Saturday night and died the following Tuesday. Dr. Bennett and Dr. Ashe (763) saw him on Sunday morning. "He was then rational and very much composed.' Doctors told him that the wound would very probably prove fatal. They extended some hope to him by means of an operation that might save him. They told him that they were preparing so he might make a statement to the magistrate. Prisoner objected to this testimony. objection overruled. NO statement by the prisoner was introduced. *Page 578 
Julius Sullivan, a brother of the deceased, was introduced and testified that he saw the deceased about 3:30 o'clock Monday morning. To an inquiry as to his condition deceased said: "I am in a bad fix." About 9 o'clock that morning deceased sent for witness and said:"Well, I am about to leave you all; I hate to leave my little children." Witness then asked him if he knew who shot him. He said: "Yes, I know who shot me; Will Boggan shot me. I have been knowing him all my life." Prisoner duly objected and excepted to the admission of this testimony. Daniel Crawford also testified to similar declarations of deceased made about the middle of Monday afternoon. Before making the statement as to who shot him, deceased said: "I am getting weaker. I believe I am going to die." Witness said he hoped not. Deceased said: "Yes, he thought he was bound to die. The doctors thought he could not possibly get well." To all of which prisoner duly excepted.
The declarations of the deceased were clearly competent. Every condition upon which dying declarations are made competent was shown to exist. The ruling of his Honor is sustained by a long and uniform current of decisions of this Court. S. v. Dixon, 131 N.C. 808.
We have examined the other exceptions to the admission of testimony. We concur with his Honor in respect to them.
The prisoner requested his Honor to charge the jury: "That upon the evidence the jury cannot find a verdict of murder in the first (764) degree." This was declined, and prisoner excepted. His Honor could not properly have given the instruction. According to the decisions of this Court, there was ample evidence, if believed by the jury, to show premeditation. Similar instructions were asked, in regard to verdict of murder in the second degree and manslaughter, an declined. The ruling upon the first prayer disposes of these. His Honor might well have given the instruction as to manslaughter, but of the course the prisoner cannot complain of his failure to do so. In no possible point of view could they find the prisoner guilty of manslaughter. His Honor's charge, set out in full, is clear, exhaustive, and absolutely fair to the prisoner. If there was any error the State alone had a right to complain. The real contest in the case centered upon the question of the identification of the prisoner. If the testimony of the only witnesses to the homicide is true, it was an unprovoked, heartless murder. There is no contradictory evidence in respect to the way in which the deceased was killed.
We have examined the exception to the reply made by his Honor to the question propounded by the jury after an hour's deliberation, and find no error therein. *Page 579 
The last exception urged by the prisoner's able the faithful counsel relates to the conduct of the jury. In respect thereto his Honor finds the following facts: "The jury, pending the trial, were quartered in the Klondyke Hotel by the officer and kept together there at night and when not attending upon the sessions of the court; that the alley in which the shooting occurred was right on one side of the hotel, and was the nearest way from the hotel to the privy, and that on two occasions the jury were carried by the office through the alley to reach the privy for the calls of nature. The first time was on the night after the jury was impaneled and before any evidence was introduced. The next time (765) was on yesterday, in the daytime, pending the argument. the court finds that the jury did not, nor did any of them, at any other time visit or go through the alley, and that there were not any remarks made by any one of the jury, nor by the officer attending them, as to the condition or appearance of the alley, and that the jury could see and id see the alley from time to time as they passed along by it going to the returning from the sessions of the court, but no remarks were made by them or any of them as to the condition of the alley or appearances therein. That the jury from the hostel windows could see and did see the alley and street along which the accused was alleged to have gone after the shooting. The court further finds that the jury could and did see the electric light, and could and did see to what extent they lighted up the alley and the streets and points at which it was testified the accused was on the night of the killing, but there was no mention of any of these conditions, nor remarks made by the members of the jury to each other, nor to any one else, nor by the office, nor any discussion by them of any of these conditions or the appearance of the place of the shooting nor any of the environments."
The prisoners, upon these findings of fact, moved the court to set aside the verdict. Motion denied. Prisoner excepted.
In respect to motions to set aside the verdicts of the jury for misconduct, the rule which control this Court is thus stated by Pearson, C.J., in S. V. Tilghman, 33 N.C. 513 (p. 553): "If the circumstances are such as merely to put suspicion on the verdict, by showing, not thatthere was, but that there might have been, an undue influence brought to bear on the jury because there was opportunity and a chance for it, it is a matter within the discretion of the presiding judge. But if the fact be that undue influence was brought to bear on the jury, as if they were fed at the charge of the prosecutor or prisoner, or if they be solicited and advised how their verdict should be, or if they be other evidence than that which was offered, in all such cases (766) *Page 580 
there has been in contemplation of law no trial, and this Court, as a matter of law, will directs a trial to be had."
This Court held in S. v. Crane, 110 N.C. 530; "When it appears only that there was an opportunity whereby to influence the jury, but not that the jury was influenced-merely opportunity and chance for it a new trial is in the discretion of the presiding judge." S. v. Miller, 18 N.C. 500.
In S. v. Gould, 90 N.C. 658, a capital felony, Mr. Justice Ashe says: "And even if the circumstances had been such (which was not the case here) as to show that there was an opportunity and chance for exerting an influence upon them, it would have been matter of discretion with the presiding judge whether he would have granted a new trial.' In this case his Honor, while properly declining to hear an affidavit from one of the jurors for the propose of impeaching the verdict, states that he examined each of the jurors orally in the presence of the prisoner land his counsel, and the record shows that the jury was polled. The presumption is, in favor of the integrity of the jury and their verdict, that they tried the case upon the law and evidence. If it is sought to impeach the verdict, the burden is upon the prisoner to show either that they were improperly influenced or that their conduct was such that as a matter of law there had been "no trial." We construe the findings and action of his Honor to mean that the jury were not influenced in arriving at their verdict by what they saw in regard to the alley and its surroundings. We do not entertain a doubt but that the learned, just, and fearless judge who heard the case and passed upon the motion would have promptly set the verdict aside, regardless of all other (767) considerations than his sense of duty, if he had even doubted its integrity. We should not hesitate to declare the law, as contended by the prisoner, regardless of this consideration, if we so found it to be. Formerly juries were selected from the vicinage, because of their supposed familiarity with the parties, witness, and surroundings. It would be impracticable to shut a jury up in a room without light, air, or exercise during a long trial, as in this case eight days, to prevent the possibility of their seeing, in passing to and from the courthouse or attending a call of nature, something which might affect their minds. Many suggestions readily occur to the mind of conditions and circumstances whichmight affect the minds of jurors which it would be impracticable to make the basis for setting their verdicts aside. The law and its administration are for the practical affairs of life. While it seeks to protect the innocent and surround the accused in the day of his trial with all of the safeguards which experience, humanity, and justice demand, it seeks also to deal with men and things in a practical way. *Page 581 
We have given the prisoner's cause a careful, anxious consideration. A jury of his country has found him guilty of an unprovoked murder of a citizen of the State. We find no error in the action of the court. He has been tried according to the "law of the land." The judgment must be
Affirmed.