STATE OF NORTH CAROLINA v. BYRON JAMES STEVENS

No. 74

(Filed 8 May 1978)

**1. Homicide § 16— dying declarations—effect of G.S. 8-51.1**

The requirements of G.S. 8-51.1 for the admission of a dying declaration that the deceased must have been "conscious of approaching death and believed that there was no hope of recovery" do not change our case-law requirements that in order to be admissible the declarations of a decedent must have been "in present anticipation of death," that is, the declarant must have been "in actual danger of death" and have had "full apprehension of his danger."

**2. Homicide § 16— dying declarations—consciousness of approaching death—belief of no hope of recovery**

The evidence supported the court's finding that decedent was conscious of approaching death and believed there was no hope of recovery where it showed that decedent had burns over 99% of his body and most were third-degree burns; his attending physician had told him explicitly that while he might live three weeks, he would not live to leave the hospital; and decedent unequivocally communicated to a detective his knowledge that he was so badly burned he was going to die by nodding his head in answer to questions asked him by the detective.

**3. Homicide § 16— dying declarations—leading questions by officer**

Dying declarations were not inadmissible because they were made in response to an officer's leading questions where the decedent was unable to speak because of tubes in his nose and throat necessitated by his injuries; the declarations were made by decedent's nodding of his head in response to the officer's questions; and the qualifying questions were appropriate in light of decedent's severe injuries and inability to speak.

**4. Homicide § 16— dying declarations—survival longer than anticipated**

The fact that decedent survived one week longer than his physician told him he might live did not affect the admissibility of his dying declarations.

5. **Homicide § 16— dying declarations—right of confrontation**

The admission of dying declarations did not deny defendant the right of confrontation guaranteed by the Sixth and Fourteenth Amendments to the U.S. Constitution and by Art. I, § 23 of the N.C. Constitution.

6. **Homicide § 16.2— dying declarations—impeachment or corroboration—general reputation of decedent**

A dying declaration is subject to impeachment or corroboration upon the same grounds and in the same manner as the testimony of a sworn witness; thus, evidence of the general character or reputation of the decedent is relevant to impeach or sustain the declaration.

7. **Homicide § 16.2— impeachment of dying declarations—decedent's criminal and alcoholic treatment records**

A dying declaration was not subject to impeachment by evidence of decedent's criminal record or his record as a patient at a treatment center for alcoholics.

8. **Bills of Discovery § 6; Constitutional Law § 30— prosecutor's failure to comply with discovery order—sanctions**

A district attorney's refusal to comply with a discovery order under G.S. 15A-903 does not automatically require the exclusion of undisclosed evidence, since a variety of sanctions is authorized by G.S. 15A-910, and the choice of which to apply, if any, rests entirely within the discretion of the trial judge.

9. **Bills of Discovery § 6; Constitutional Law § 30— use of in-custody statements on rebuttal—failure to disclose—recess for inspection of statements**

The trial court in a homicide case did not err in permitting the State to present on rebuttal defendant's oral statements to officers which were inconsistent with his trial testimony, but which had not been disclosed by the district attorney to defense counsel, where the court granted a recess to allow defense counsel an opportunity to inspect defendant's statements and to interview the officers and thus fully protected defendant's legitimate rights to know the full extent of the case against him and be protected from the use of surprise evidence. Defendant's assertion that defense counsel would have advised defendant not to testify if he had known of the prior contradictory statements did not render admission of the statements prejudicial error since the purpose of the statutory discovery procedure was not to protect a defendant from the consequences of perjury.

APPEAL by defendant from his conviction of first degree murder before *Barbee, S. J.*, at the 8 November 1976 Session of MECKLENBURG Superior Court, docketed and argued as Case No. 115 at the Spring Term 1977.

At the trial the State's evidence tended to show:

Around 10:30 p.m. on 6 June 1976 Mabel Kirkpatrick was sitting in the front yard of her Charlotte apartment when she heard

an explosion, the sound of breaking glass and screams coming from behind the building. She ran toward the sound and saw a black male, identified as the deceased, Amos Belk, walk out of the house at 325 East Tremont Street. He was on fire; "it was dripping from his legs." She called the police; firemen and an ambulance were also summoned.

Upon their arrival firemen found "several fires in the apartment at different places." The main fire was located in the first bedroom on the left and extended up the hallway into the bathroom. The worst involvement of fire and smoke was in the bedroom, concentrated on the mattress only three or four feet from the hall door. As soon as the firemen entered the house they immediately noticed the odor of a "petroleum product," and observed a "five gallon can of gasoline sittin' in the hallway." Fireman Maurice Williams immediately took the can outdoors because of the dangerous fumes it was emitting. The carpet around the can was scorched but the circle it occupied was clean. In the bathroom the firemen discovered the bathtub three-fourths full and the water still running. A man's shoes, shirt and pants were on the floor "like he'd stepped out of them." They were on fire.

When Fireman McAnulty arrived at the scene he saw a thin man, completely nude except for a band of elastic from his underwear, leaning against a car in the driveway. This man was severely burned, and McAnulty motioned to the ambulance, which took him away.

James O. Davis, a fire investigator for the Charlotte Fire Department and an expert in determining the cause and point of origin of a fire, testified as follows: When he entered the house on 325 Tremont on 6 June 1976, he too smelled a petroleum product in the bedroom. "The extent of damage was more or less in the bed area and the paint was scorched and the heat marks all on the wall. . . . In the bathroom area, there was a pair of trousers still smoldering slightly, a pair of shoes and another particle of clothing there. . . . and also, a rolled up torch piece of paper, half burned. I smelled a petroleum product in the bathroom. . . . I looked back up the hall. There was a scorched area on the carpet up the hall toward the bedroom. . . . The scorched area was darker looking up the hall than it was looking down the hall toward the

bathroom area. The dark scorched area indicates to me as a fire investigator that . . . the point of origin . . . was in the bathroom igniting the vapors leading back to the bedroom. The fire started in the bathroom. . . . The carpet I've talked about in this case was singed across the top, as if it were a vapor fire rather than a liquid gasoline fire in that carpet."

Davis explained that gasoline "puts off a vapor, . . . a gas that floats . . . and by this igniting, it goes back to the riches. In other words, where the gas is originally deposited, poured or whatever . . . no matter how long a trail is, the fire will go right straight back up this vapor trail to the richest part and ignite. So, if gasoline had been poured on a bed in the front bedroom and there was a vapor trail leading from that bed to the bathroom and there was an ignition in the bathroom, then the fire could travel back up the hallway to the bed."

Chemical analysis of the partially burned "torch piece of paper," and the trousers and the shoes found in the bathroom revealed that all contained gasoline. An analysis of a sample of liquid taken from the can found in the hall revealed it also to be gasoline.

Dr. James C. Stevens of the surgical staff at Charlotte Memorial Hospital testified that Amos Belk, who had just been severely burned, was admitted to the hospital "in the late evening hours" of 6 June 1976. Ninety-nine percent of his body was burned—"all but the soles of his feet." The burns were third-degree burns. Dr. Stevens treated Belk for six to eight consecutive hours that night. "If we had not performed those procedures, he would have lived probably no more than two hours." Within the first 45 to 60 minutes from the time Belk came into the emergency room Stevens told Belk that "he was quite critical, quite critically ill. That he would almost certainly not survive to leave the hospital, that his chances of living two or three weeks were fairly good, but his chances of surviving any more than that were practically nil." Thereafter Dr. Stevens told Belk the same thing several more times—at least two or three, the last time being around 8:00 a.m. on 7 June 1976. Dr. Stevens said he felt quite sure that Belk understood him for he gave intelligent answers to all his questions.

Charlotte Police Officer S. T. Wallace, who went to the emergency room of Charlotte Memorial Hospital around midnight on 6 June 1976 to interview Belk, testified as follows: "I asked him what happened. He told me that Byron poured gas on [him] and set [him] on fire. I asked him, Byron who. He said, 'Byron Stevens.' I asked him why. He told me that because he would not play around with Byron. I asked him what did he mean by playing around. He said, 'Sexually. He's a punk.' He then said, 'Get him. He's mean.'" (The court struck the remark "Get him. He's mean," and instructed the jury not to consider it.)

Detective D. L. Sharpe also spoke with Belk that night in the emergency room. Belk repeated in essential detail the accusations against defendant, his roommate, which he had made to Officer Wallace.

Sharpe returned to speak with Belk again the next morning about 9:45 o'clock. By this time Belk was so encumbered with nasal tubes that he could not speak. Nonetheless, he was able to answer Sharpe's questions either by nodding his head to indicate assent, or by shaking it to indicate a negative answer. Sharpe, testifying from notes, gave a verbatim account of the interview. The session began with the following questions and answers:

"SHARPE: Did you get burned last night?
                              Nod of head affirmative.

"SHARPE: Did you get burned at your house?
                              Nod of head affirmative.

"SHARPE: Do you know how bad you are burned?
                              Nod of head affirmative.

"SHARPE: Do you think that you're going to die?
                              Nod of head affirmative.

"SHARPE: Did he, the doctor, tell you that you were burned
         real bad?                Nod of head affirmative.

"SHARPE: Did the doctor tell you you were going to die?
                              Nod of head affirmative.

Sharpe then proceeded to ask Belk leading questions as to how and why he had come to be burned. The following story emerged: Belk and Stevens were roommates in the house on East

Tremont. Earlier in the evening, about 8:00 a.m., he and Stevens had had an argument over $60 that Stevens allegedly owed Belk. No blows were passed. Both had been drinking wine and beer. Stevens and Belk had another argument over sex. Belk and defendant had had sex before, and defendant "got mad this time" because Belk would not. Belk went to bed between 9:00 and 10:00 p.m. with his clothes on and awoke to find Stevens pouring gasoline over him. Belk went into the bathroom, took off his clothes and began to draw a bath to wash off the gasoline. While Belk was in the bathroom, Stevens reappeared and threw a flaming torch into the bathroom. The room exploded and Belk ran out of the house. Defendant never came back into the house before Belk ran out. Defendant had never gotten mad at him like this before; nor had he ever poured gasoline on him before.

On 3 July 1976, four weeks after he was admitted to the hospital, Amos Belk died from severe body burns.

Defendant Stevens testified in his own behalf. He said that earlier in the day of the fire a friend of his had cut the grass around the house on Tremont. During that time, "Belk was out there with a stick, gas and paper, putting paper in the hole and pouring gasoline and lighting a match saying he was killing snakes. The lawn mowing lasted until we ran out of gas." Stevens then got more gasoline that he had stored in a five gallon container in his car.

Later Belk and the friend began to drink. Stevens said that he did not drink at all. Around 9:00 p.m. Belk began to draw a bath. At his request, Stevens left to buy some beer and wine. When he returned, Belk asked him to bring the gasoline can into the house. Belk was standing in his bedroom door, smoking a cigarette. When Stevens approached with the gasoline can, Belk moved toward him and grabbed the can, which had no lid. Stevens dropped the can, and it caught fire and exploded. Stevens immediately ran out of the house. He was burned on the hand, arm and leg. When he turned around he saw Belk was "wallowing in the floor on fire. . . . I ran back inside. I grabbed a spread that was on the door drying. I ran through the fire. . . . I grabbed him, throwed the spread around him and I brought him out." Defendant was about to carry Belk to the hospital in his car when the ambulance arrived and took them both to the hospital. Defendant,

however, took a taxi back home because he was concerned about the fire and he needed to change his clothes. His pants and shirt were torn, soiled and bloody. At his home he found firemen, newsmen and police. After defendant changed clothes one of them there told him he had better go back to the hospital or "that burn" would get infected. He then drove back to the hospital where he was treated.

Stevens, on cross-examination, specifically denied pouring gasoline on Belk and throwing a lighted torch into the bathroom. He also denied that he had wanted to have sexual relations with Belk. He denied speaking with Officer H. W. Richardson immediately after the fire and telling him that Belk had set the house on fire through smoking in bed. He denied telling Officer Hayes at the house that Belk had left the gas can in the house, gotten drunk and knocked it over and had then lit a cigarette and started the fire.

Four witnesses for defendant said his reputation in the community was good.

On rebuttal, over defendant's objection, the State introduced the testimony of Officers Richardson and Hayes. Richardson testified that he was the first officer on the scene at 326 East Tremont that evening. He said, "I saw Byron Stevens. He was standing behind an automobile in the driveway. He came out to the car when I pulled up requesting help for Mr. Belk. When I went up, I asked what had happened; mainly directed my question to Mr. Belk to try to determine his physical condition and I could get no answer from him." Stevens told him that Belk had taken a bath and then gone to bed; that Belk had caught himself on fire while smoking. Richardson said that Stevens also said that "he helped Mr. Belk get out of the house."

Officer Hayes then testified that while he was in the house that evening, Stevens came in about midnight. "He told me that his roommate had cut grass earlier and that the roommate had left gas cans in the house. He said that his roommate had gotten drunk, knocked over a gas can and lit a cigarette. He said a fire started, both of them were burned and they ran out of the house knocking out the front door glass in the process."

The jury returned a verdict of first-degree murder and from the sentence of life imprisonment defendant appealed.

*Attorney General Rufus L. Edmisten and Associate Attorney Donald W. Grimes for the State.*

*Shelly Blum and Michael A. Sheely for defendant.*

SHARP, Chief Justice.

Prior to trial defendant moved to exclude testimony by Officers Wallace and Sharpe with reference to any statements which Belk made to them in the hospital. The grounds assigned were: (1) that the statements failed to meet the requirements of N.C. G.S. 8-51.1 (Cum. Supp. 1977) and our case law for the admission of dying declarations; and (2) that the admission of a decedent's dying declaration denied defendant the right of confrontation guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution. After conducting a *voir dire* the court ruled that the challenged statements met the requirements for dying declaration and denied the motions to suppress. Assignment of error No. 3 challenges this ruling.

"Dying declarations" by the person whose death is an issue in the case have long been admissible in North Carolina provided (1) At the time they were made the declarant was in actual danger of death; (2) he had full apprehension of the danger; (3) death did in fact ensue; and (4) declarant, if living, would be a competent witness to testify to the matter. *See, e.g., State v. Poll*, 8 N.C. 442, 9 Am. Dec. 655 (1821); *State v. Thomason*, 46 N.C. 274 (1854); *State v. Jordan*, 216 N.C. 356, 5 S.E. 2d 156 (1939); *State v. Crump*, 277 N.C. 573, 178 S.E. 2d 366 (1971). In 1973, the General Assembly codified the essentials of those requirements in G.S. 8-51.1 which made the "dying declarations of a deceased person regarding the cause or circumstances of his death" admissible in all tribunals "subject to proof that: (1) At the time of the making of such declaration the deceased was conscious of approaching death and believed there was no hope of recovery; (2) Such declaration was voluntarily made."

Defendant does not contend that Belk's statements were involuntary. Rather, his contention is that the evidence was insufficient to support the trial judge's finding that when Belk spoke with Officer Wallace and Detective Sharpe he was "conscious of approaching death and believed there was no hope of recovery." The admissibility of these declarations was a decision for the

trial judge, and our review is limited to the narrow question of whether there was any evidence tending to show the factual prerequisites to admissibility. *State v. Bowden*, 290 N.C. 702, 712, 228 S.E. 2d 414, 421 (1976); *State v. Gordon*, 241 N.C. 356, 362, 85 S.E. 2d 322, 326 (1955); *State v. Stewart*, 210 N.C. 362, 370, 186 S.E. 488, 492 (1936); 1 Stansbury's North Carolina Evidence § 146 (Brandis rev. 1973).

[1]  In *State v. Bowden, supra*, and in *State v. Cousin*, 291 N.C. 413, 230 S.E. 2d 518 (1976), we noted, without deciding, that the words "no hope of recovery" in the statute might make the statutory exception to the hearsay rule more restrictive than existing case law. We have now concluded that the statutory prerequisites that the deceased must have been "conscious of approaching death and believed that there was no hope of recovery" do not change our case-law requirements that in order to be admissible the declarations of a decedent must have been "in present anticipation of death." *State v. Brown*, 263 N.C. 327, 139 S.E. 2d 609 (1965). *See State v. Bowden*, 290 N.C. 702, 712, 228 S.E. 2d 414, 421 (1976). *See also* 1 Stansbury's North Carolina Evidence § 146 at 488, n. 17 (Brandis rev. Supp. 1976) where Professor Brandis expressed this view. As the rule is commonly stated in the opinions of the Court, declarant must have been "in actual danger of death" and have had "full apprehension of his danger." *State v. Jordan*, 216 N.C. 356, 362, 5 S.E. 2d 156, 159 (1939). Further, "[i]t is not necessary that the declarant should be in the very act of dying; it is enough if he be under the apprehension of impending dissolution." *State v. Dalton*, 206 N.C. 507, 513, 174 S.E. 422, 426 (1934). Stated in simpler terms, it is enough if he "believed he was going to die." *State v. Tate*, 161 N.C. 280, 282, 76 S.E. 713, 714 (1912). *Accord, State v. Bright*, 215 N.C. 537, 2 S.E. 2d 541 (1939); *State v. Boggan*, 133 N.C. 761, 763, 46 S.E. 111, 114 (1903). Obviously, if one believes he is going to die he believes there is "no hope of recovery." This common law and statutory requirement rests upon the tenet that when an individual believes death to be imminent, the ordinary motives for falsehood are absent and most powerful considerations impel him to speak the truth. The solemnity of approaching death "is considered by the law as creating an obligation equal to that which is imposed by a positive oath administered in a court of justice." *State v. Jordan, supra* at 363, 5 S.E. 2d at 160.

[2]   Plenary evidence in the record supports the court's finding that Belk was conscious of approaching death and believed there was no hope of recovery. "This [consciousness] may be made to appear from what the injured person said; or from the nature and extent of the wounds inflicted, being obviously such that he must have felt or known that he could not survive; as well as from his conduct at the time and the communications, if any, made to him by his medical advisers, if assented to or understandingly acquiesced in by him." *Mattox v. United States*, 146 U.S. 140, 151, 36 L.Ed. 917, 921, 13 S.Ct. 50, 54 (1892). *See State v. Stewart*, 210 N.C. 362, 369, 186 S.E. 488, 492 (1936). *Accord, State v. Bowden*, 290 N.C. 702, 228 S.E. 2d 414 (1976); *State v. Gordon*, 241 N.C. 356, 85 S.E. 2d 322 (1955); *State v. Rich*, 231 N.C. 696, 58 S.E. 2d 717 (1950). Belk had burns over 99 percent of his body and most were third-degree burns. His attending physician had told him explicitly that while he might live three weeks, he would not live to leave the hospital.

[3]   The circumstances attending Belk's declarations were such that he must have known death was impending. Although the tubes in his nose and throat necessitated by his injuries prevented him from speaking, Belk clearly and unequivocally communicated to Detective Sharpe his knowledge that he was so badly burned he was going to die. Defendant, however, insists that Belk's declarations should have been excluded because they were made in response to leading questions. Ceratinly the questions which the detective propounded were leading. However, it is pertinent to note that could all the circumstances accompanying Belk's interrogation by the detective have been repeated at the trial below, the judge undoubtedly would have permitted the district attorney to examine Belk similarly. *See State v. Greene*, 285 N.C. 482, 492, 206 S.E. 2d 229, 235-36 (1974). Further, the qualifying questions were not perfunctory to be used "in the event the injured man perchance took a turn for the worse." They were clearly appropriate in light of Belk's severe injuries and inability to speak. They were "as nearly spontaneous as declarations by one under the circumstances could be." *See State v. Gordon*, 241 N.C. at 362, 85 S.E. 2d at 326.

[4]   Nor does the fact that Belk survived one week longer than Dr. Stevens had told him he might live affect the admissibility of his dying declarations. "The test is the declarant's belief in the

nearness of death when he made the statement, not the actual swiftness with which death ensued." C. McCormick, Evidence § 281, at 681 (2d Ed. 1972); *State v. Jordan*, 216 N.C. 356, 363-64, 5 S.E. 2d 156, 160 (1939).

[5] Defendant next contends that the admission of dying declarations violated that portion of U.S. Const. amend. VI which guarantees an accused "the right . . . to be confronted with the witnesses against him" and N.C. Const. art. I, § 23 (1971) (formerly § 7 of the Bill of Rights, N.C. Const. of 1776), which provides that "every person charged with crime has the right . . . to confront the accusers and witnesses with other testimony. . . ." Albeit a dying declaration is indubitably hearsay and the declarant is, of course, not available for cross-examination, this contention has long since been decided against defendant.

In 1850, in the case of *State v. Tilghman*, 33 N.C. 513, the defendant contended that the confrontation clause of section 7 of the Bill of Rights excluded the admission of dying declarations in evidence. In rejecting this argument Justice Pearson, later Chief Justice, said: "This section of the Bill of Rights was aimed at the old practice, by which prisoners were not allowed to have witnesses *sworn* on their behalf, and the testimony came altogether on the part of the crown. Our ancestors did not intend to deny the rule of evidence as to dying declarations, but to assert that in criminal prosecutions prisoners ought to be allowed to have witnesses in their behalf, sworn and examined." *Id.* at 554.

Defendant argues that the rationale of this 128-year-old decision is no longer "viable precedent given the treatment of the right to confrontation/cross-examination by the United States Supreme Court" in its more recent decisions interpreting the sixth amendment. *E.g.*, *Pointer v. Texas*, 380 U.S. 400, 13 L.Ed. 2d 923, 85 S.Ct. 1065 (1965); *Douglas v. Alabama*, 380 U.S. 415, 13 L.Ed. 2d 934, 85 S.Ct. 1074 (1965); *California v. Green*, 399 U.S. 149, 26 L.Ed. 2d 489, 90 S.Ct. 1930 (1970). We need not, however, compare these cases with *Tilghman*, *supra*, or discuss its rationale, for it is the federal constitution which controls the decision in this case.

The Confrontation Clause of the sixth amendment was made applicable to the states in *Douglas v. Alabama*, *supra*. However,

we find no conflict in our decisions and those of the United States Supreme Court with reference to the admission of dying declarations in evidence. The opinions of the Supreme Court, before and since *Douglas v. Alabama,* have made it clear that the constitutional guaranty of confrontation is not coextensive with the hearsay rule. *See California v. Green,* 399 U.S. 149, 154-56, 26 L.Ed. 2d 489, 495-96, 90 S.Ct. 1930, 1933-34 (1970); *Dutton v. Evans,* 400 U.S. 74, 80, 27 L.Ed. 2d 213, 222, 91 S.Ct. 210, 215 (1970). Further, the public necessity of preventing secret homicides from going unpunished requires the preservation of this uniquely valuable evidence notwithstanding the inability of the defendant to cross-examine his accuser.

In *Mattox v. United States,* 156 U.S. 237, 243-244, 39 L.Ed. 409, 411, 15 S.Ct. 337, 340 (1894), Mr. Justice Brown, speaking for the Court, said that many of the constitutional provisions "in the nature of a Bill of Rights are subject to exceptions, recognized long before the adoption of the Constitution, and not interfering at all with its spirit. Such exceptions were obviously intended to be respected." As one such exception he specifically mentioned the admission of dying declarations. "They are admitted," he said, "not in conformity with any general rule regarding the admission of testimony, but as an exception to such rules, simply from the necessities of the case, and to prevent a manifest failure of justice. . . . [T]he sense of impending death is presumed to remove all temptation to falsehood, and to enforce as strict an adherence to the truth as would the obligation of an oath."

In *Kirby v. United States,* 174 U.S. 47, 61, 43 L.Ed. 890, 896, 19 S.Ct. 574, 579 (1899) (a case in which the thief's record of conviction was held inadmissible under the Confrontation Clause in the defendant's trial for receiving stolen property) the Court said: "It is scarcely necesary to say that to the rule that an accused is entitled to be confronted with witnesses against him the admission of dying declarations is an exception which arises from the necessity of the case. This exception was well established before the adoption of the Constitution, and was not intended to be abrogated. The ground upon which such exception rests is that from the circumstances under which dying declarations are made they are equivalent to the evidence of a living witness upon oath. . . ."

In writing the opinion in *Pointer v. Texas, supra,* a case which reached a result similar to *Kirby v. United States,* Mr. Justice Black was also careful to say: "This Court has recognized the admissibility against an accused of dying declarations, *Mattox v. United States.* . . . Nothing we hold here is to the contrary." 380 U.S. at 407, 13 L.Ed. 2d at 928, 85 S.Ct. at 1069. This statement was repeated in the Court's decision in *Dutton v. Evans,* 400 U.S. at 80, 27 L.Ed. 2d at 222, 91 S.Ct. at 215 (1970).

The rationale of *Mattox* and *Kirby* was reiterated by this Court in *State v. Debnam,* 222 N.C. 266, 22 S.E. 2d 562 (1942) as follows:

"The theory on which dying declarations are excepted from the hearsay rule and admitted in evidence is that the declaration is made under the realization of approaching death, when there is no longer any motive for making a false statement, thus creating a sanction for truth equal to that of an oath. [Citations omitted.] Perhaps a more potent reason, one strong enough to supersede the right of confrontation, so strongly entrenched in our law, is the necessity of preserving important evidence, which often could come from no other source, of the identity of the killer and such circumstances of the killing as come within the range of the exception." *Id.* at 268-69, 22 S.E. 2d at 564.

Defendant's assignments of error Nos. 4 and 5 are overruled.

For the purpose of impeaching Belk's dying declaration, defendant attempted to introduce Belk's record of convictions—one of store breaking and larceny, one of assault with a deadly weapon, and numerous convictions of public drunkness. Defendant also attempted to prove by the testimony of the acting director of the Public Inebriate Program, a treatment center for alcoholics, that Belk was a frequent patient at the center. The court sustained the State's objection to this evidence and defendant's assignments 4 and 5 challenge this ruling.

[6] Once admitted into evidence, a dying declaration is no different from other testimony. The extent of its credibility is a matter for the jury and it is subject to impeachment or corroboration upon the same grounds and in the same manner as the testimony of a sworn witness. *State v. Debnam,* 222 N.C. 266, 22 S.E. 2d 562 (1942); *State v. Thomason,* 46 N.C. 274 (1854); *State v. Tilghman,*

33 N.C. 513 (1850). *See also* 1 Stansbury's North Carolina Evidence § 146 (Brandis rev. 1973) (hereinafter cited as Stansbury). Thus, evidence of the *general* character or reputation of a decedent is relevant on the issue of his dying declaration and is admissible to impeach or to sustain the declaration. Stansbury §§ 107, 114. This is an exception to the usual rule that "evidence as to the general moral character of the deceased is not admissible in a prosecution for homicide." *State v. Vestal*, 278 N.C. 561, 580, 180 S.E. 2d 755, 768 (1971), *cert. denied*, 414 U.S. 874, 38 L.Ed. 2d 114, 94 S.Ct. 157 (1973). *See* Stansbury § 106.

[7] Nevertheless, the impeachment of a dying declaration must proceed under the ordinary rules of evidence. Under these rules, for the purpose of impeachment, a party is entitled to introduce evidence only of the general reputation or character of the witness. "Therefore, our courts do not permit the witness to be impeached by independent evidence of particular misconduct." Specifically, this means that a witness may not "be impeached by record evidence of his conviction of crime, introduced either in contradiction of his denial thereof, or independently as evidence going to his credibility." *State v. King*, 224 N.C. 329, 331, 30 S.E. 2d 230, 231 (1944). *See State v. Adams*, 193 N.C. 581, 137 S.E. 657 (1927); *State v. Cathey*, 170 N.C. 794, 87 S.E. 532 (1916); *Edwards v. Price*, 162 N.C. 243, 78 S.E. 145 (1913); Stansbury § 111. Under the circumstances of this case, this same rule applies to Belk's records at the treatment center for alcoholics.

Defendant argues, however, that had Belk himself been able to testify he could have been cross-examined with reference to his convictions of crime (*See State v. Foster*, 293 N.C. 674, 239 S.E. 2d 449 (1977); Stansbury § 112); and that, since such cross-examination is impossible in the case of dying declarations, Belk's criminal record should have been admitted in lieu of cross-examination. We do not agree. The same considerations which engendered the rule that the character of a witness testifying at the trial cannot be proven by specific acts apply to the character of a deceased declarant; another rule "would raise innumerable collateral issues." *State v. Canup*, 180 N.C. 739, 741, 105 S.E. 322, 324 (1920). *See* Stansbury § 111. It was, of course, open to defendant to offer evidence of Belk's general character and reputation just as he offered evidence of his own, but he did not do so. Assignments of error Nos. 4 and 5 are overruled.

Defendant's assignment of error No. 13 is that the trial judge erred in allowing the State to elicit as rebuttal evidence the testimony of Officers Hayes and Richardson as to oral statements which each said defendant had made to him on the night of the fire. These statements, as indicated in the preliminary resume of the facts, were inconsistent with defendant's testimony. When Officers Hayes and Richardson were called, and the import of their testimony ascertained, defendant objected on the grounds that (1) upon defendant's motion N.C. Gen. Stats. 15A-902 and 15A-903(a)(2) (1975) required the district attorney, before trial, to disclose to defendant the substance of these oral statements; (2) the district attorney had failed to make the disclosure; and (3) this failure required the exclusion of the statements. Upon this objection, in the absence of the jury, the judge conducted a *voir dire* during which both the district attorney and defense counsel made statements. Together they disclosed the following sequence of events:

Prior to the trial, pursuant to G.S. 15A-902, defense counsel requested the district attorney to make certain disclosures which, upon defendant's motion, would be required under G.S. 15A-903. Specifically, counsel requested "that the State make available: A, Statements made by the defendant under 15A-903(a)(1)," (*i.e.*, written or recorded statements made by defendant which are under the control of the State); B, Defendant's prior criminal record; and C, Certain documents and other tangible objects. Counsel did not request disclosure under G.S. 15A-903(a)(2) of "the substance of any oral statement made by defendant which the State intends to offer in evidence at the trial." In his reponse to counsel's request, on 9 August 1976 the district attorney wrote him that defendant had made no written or recorded statement and had made no oral statement which he intended to offer in evidence at the trial.

The district attorney made the following explanation to the court: He interpreted G.S. 15A-903(a)(2) as requiring him to divulge only those statements which he intended, before trial, to introduce during the presentation of his case in chief. Since defendant's statements were all exculpatory he could not use them in making out the State's case. Therefore, "because in preparation of the case [he] did not intend to offer those in the trial" he had decided not to disclose the statements to counsel.

Further, as late as the preceding afternoon, defense counsel had told him that defendant had not decided whether to testify in his own defense.

In answer to the court's specific inquiries, counsel admitted that he had asked defendant whether he had made any statements to the police; that defendant had told him he had talked to the police and he had taken his client at his word; that he had not moved the court to order the solicitor to divulge the substance of any oral statements made by defendant because he interpreted the solicitor's statement as meaning "there weren't any such statements, that he had given [him] everything."

At this point in the *voir dire* the district attorney produced the statements for counsel's inspection. The court then entered an order in which he found facts consistent with the foregoing summary and overruled defendant's objection to the rebuttal testimony of Officers Richardson and Hayes. The judge also found, *inter alia*: (1) that in developing its case the State did not offer any oral statements made by defendant; (2) that, only after defendant had decided to take the stand and had testified, did the State decide to offer defendant's oral statements; and (3) that the State "has not acted in bad faith in this matter and that at the time the State responded to the voluntary request, the State did not intend to offer into evidence any oral statements allegedly made by defendant."

The judge then recessed court to give defendant's counsel time to examine the statements and the officers' original notes. Counsel was also informed that after the recess he would be allowed to cross-examine the officers before they testified before the jury.

It is implicit in the district attorney's statement to the court that his intention not to offer the questioned evidence was conditional. Obviously, he did intend to use the statements on rebuttal if defendant took the stand and gave testimony inconsistent with them. It is equally obvious that the district attorney could not know whether defendant would take the stand until defendant either did so or rested his case without having testified. This uncertainty, however, differs little from that which surrounds many decisions the prosecutor must make with reference to the introduction of available evidence. To adopt the district attorney's

analysis of G.S. 15A-903(a)(2) would mean that a judge could rarely hold that a district attorney had intended to use a withheld statement at trial.

In view of the obvious intent of the legislature to permit broad pretrial discovery — as evidenced by the statute's sweeping language, "any oral statement made by the defendant which the State intends to offer in evidence at the trial" — prudent prosecutors will avoid the possibility of having their intent judicially second guessed by turning over all doubtful material to the defense upon request. Likewise, defense counsel would be well advised to specifically request the defendant's oral statements when, as here, the client informs him he has talked to the officers.

[8]  In this case, however, we need not attempt to stake out the limits of G.S. 15A-903(a)(2) or decide whether the district attorney's reply to counsel's request obviated the necessity of a motion under that statute. A district attorney's refusal to comply with a discovery order under G.S. 15A-903 does not automatically require the exclusion of the undisclosed evidence. A variety of sanctions is authorized by G.S. 15A-910, and the choice of which to apply — if any — rests entirely within the discretion of the trial judge. His decision will not be reversed except for abuse of that discretion. *State v. Thomas*, 291 N.C. 687, 692, 231 S.E. 2d 585, 588 (1977). Clearly, this record shows no abuse of judicial discretion.

[9]  Defendant concedes that the State's use of his oral statements to the officers did not violate any of his *Miranda* related rights. *See Harris v. New York*, 401 U.S. 222, 28 L.Ed. 2d 1, 91 S.Ct. 643 (1971); *State v. Biggs*, 292 N.C. 328, 233 S.E. 2d 512 (1977). In his brief, however, counsel does assert that defendant was irreparably prejudiced by the admission in evidence of his prior contradictory statements because, "[i]f counsel had known of these two statements, he would have advised the defendant to refrain from testifying." No doubt counsel would have so advised defendant. Notwithstanding, the purpose of the discovery procedure authorized by N.C. Gen. Stats., Ch. 15A, Art. 48 (1975) was not to protect a defendant from the consequences of perjury. It was intended only to protect him from the consequences of unfair surprise and to enable him to have available at the trial any evidence which he could legitimately offer in his defense. Analogous here is the statement of Chief Justice Burger in

*Harris v. New York, supra* at 225, 28 L.Ed 2d at 4-5, 91 S.Ct. at 645-46, a case in which the officers' failure to give the defendant the *Miranda* warning prevented the State from offering his state-ment in evidence on the question of his guilt:

"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be con-strued to include the right to commit perjury. [Citations omitted.] Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. . . . The shield provided by *Miranda* can-not be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsist-ent utterances. We hold, therefore, that petitioner's credibility was appropriately impeached by use of his earlier conflicting statements."

The trial court's order granting a recess to allow defendant an opportunity to inspect defendant's statements and to inter-view the officers, fully protected defendant's legitimate rights to know the full extent of the case against him and to be protected from the use of "surprise evidence." Defendant cannot complain that the order did not also protect him from the folly and crime of false testimony. Assignments of error Nos. 7 and 13 are over-ruled.

We have carefully examined defendant's remaining assignments of error. They are without merit and require no discussion. The record manifests that defendant received a fair trial, free from prejudicial error.

No error.